# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TZIVA RAPOPORT-HECHT, MAGGIE TSAN and ERICA WILDSTEIN on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>     v.<br><br>SEVENTH GENERATION, INC.,<br><br>            Defendant. | Civil Action No. 7:14-cv-09087-KMK |

## CLASS SETTLEMENT AGREEMENT

## TABLE OF CONTENTS

Page

I.      RECITALS ........................................................................................................1

II.     DEFINITIONS ..................................................................................................7

III.    CERTIFICATION OF THE SETTLEMENT CLASS AND PRELIMINARY
        APPROVAL .....................................................................................................15

IV.     SETTLEMENT CONSIDERATION AND BENEFITS ...................................16

        4.1     Settlement Fund ...................................................................................16
        4.2     Eligibility and Process for Obtaining a Cash Payment ........................18
        4.3     Distribution to Authorized Settlement Class Members ........................23
        4.4     Excess or Insufficient Funds in the Settlement Fund...........................23
        4.5     Injunctive Relief: Modification of SVG Products' Labels and Website ..............24
        4.6     Other Injunctive Relief Terms and Conditions....................................25
        4.7     Permitted Conduct ...............................................................................26

V.      NOTICE TO CLASS AND ADMINISTRATION OF PROPOSED
        SETTLEMENT..................................................................................................27

        5.1     Duties and Responsibilities of the Settlement Administrator ...............27

VI.     OBJECTIONS AND REQUESTS FOR EXCLUSION ...................................32

VII.    RELEASES .......................................................................................................35

VIII.   ATTORNEYS' FEES AND EXPENSES AND CLASS REPRESENTATIVE
        INCENTIVE AWARDS ...................................................................................37

IX.     NO ADMISSION OF LIABILITY ..................................................................38

X.      ADDITIONAL PROVISIONS .........................................................................39

## <u>TABLE OF EXHIBITS</u>

Exhibit A:     Claim Form

Exhibit B:     Class Notice or Long Form Notice

Exhibit C:     Notice Plan, Declaration of Steven Weisbrot with Respect to Settlement Notice
               Plan

Exhibit D:     Summary Notice or Short Form Notice

Exhibit E:     SVG's Products

Exhibit F:     Declaration of Michael F. Jacobson, Ph.D., in Support of Plaintiffs' Unopposed
               Motion for Preliminary Approval of Settlement

Exhibit G:     Declaration of Richard E. Dubois, Executive Director, National Consumer Law
               Center

# CLASS SETTLEMENT AGREEMENT

This Class Settlement Agreement is entered into this 21st day of June, 2016 by and between Plaintiffs Maggie Tsan, Erica Wildstein, and Tziva Rapoport-Hecht ("Plaintiffs"), on behalf of themselves and each of the Settlement Class Members, on the one hand, and Defendant Seventh Generation, Inc. ("SVG" or "Defendant"), a Vermont corporation, on the other hand (collectively, Plaintiffs and Defendant are the "Parties").  The Parties intend for the Class Settlement Agreement to fully, finally, and forever resolve, discharge, and settle all released rights and claims, subject to the terms and conditions set forth herein.

## I.    RECITALS

1.1    Two putative class actions involving three named plaintiffs have been filed and originally were pending in two different jurisdictions, all challenging the labeling, marketing, and advertising of certain of SVG's Products.  Plaintiffs allege that certain of SVG's Products are neither "natural," nor "hypoallergenic," nor "non-toxic" and are inaccurately and deceptively labeled as "natural," "hypoallergenic" and "non-toxic." Each action is discussed, in turn, below.

1.2    On October 15, 2013, Halunen Law and Reese LLP, formerly known as Reese Richman LLP, sent a Notice of Violation of California Consumer Legal Remedies Act ("CLRA") letter on behalf of their client and a proposed class of consumers to Seventh Generation, Inc. alleging that SVG's labeling, marketing and advertising of its products as "natural" violated California Civil Code section 1750, *et seq.*, and various other state and common laws ("CLRA Letter").

1.3    Counsel for Plaintiff Tsan and counsel for SVG immediately engaged in confidential, pre-litigation discovery and settlement negotiations.  Counsel exchanged significant

information, including information regarding the products at issue in the CLRA Letter, the ingredients contained within those products, and the labeling of the products.

1.4    Counsel for Plaintiff Tsan, counsel for SVG, and an employee of SVG conducted an in-person settlement meeting on March 6, 2014, in Irvine, California, to discuss the claims in the Action, specifically the alleged natural qualities of the ingredients and the manufacturing processes used for each allegedly non-natural ingredient.

1.5    After a further exchange of information between Defendant and Counsel for Plaintiffs Tsan and Wildstein, two pre-filing sessions of mediation were held between Defendant SVG and Counsel for Plaintiffs Tsan and Wildstein on June 18, 2014 and September 8, 2014, before the Honorable Edward A. Infante (Ret.) of JAMS in San Francisco.   The parties were unable to reach a resolution, however, and continued to engage in settlement negotiations following the September 8, 2014 mediation session.

1.6    On November 14, 2014, plaintiff Tziva Rapoport-Hecht on behalf of herself and a proposed class filed a class action complaint in the United States District Court, Southern District of New York against Seventh Generation, Inc. (S.D.N.Y. Case No. 7:14-CV-09087) (the "Rapoport-Hecht Action") alleging the following causes of action: (1) unlawful and deceptive business practices in violation of New York General Business Law section 349 ("GBL § 349); (2) false advertising in the conduct of business in violation of New York General Business Law section 350 ("GBL § 350"); (3) breach of express warranty; (4) breach of implied warranty of merchantability; (5) breach of implied warranty of fitness for a particular purpose; and (7) unjust enrichment, all in connection with the composition of certain of Seventh Generation, Inc.'s products whose labels contained one or more of the terms "natural," "hypoallergenic," and/or "non-toxic," and requested injunctive relief.

1.7     On January 14, 2015, plaintiffs Maggie Tsan and Erica Wildstein filed a complaint on behalf of themselves and a proposed class against Seventh Generation, Inc. in the United States District Court, Northern District of California (N.D. Cal. Case No. 3:15-CV-00205) (the "Tsan Action") alleging the following causes of action: (1) selling products in breach of an implied warranty in violation of the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.;* (2) false representation on product packaging and in marketing the products as "natural" in violation of the California Consumers Legal Remedies Act (Cal. Code § 1750, *et seq.*); (3) disseminating untrue or misleading statements about the products in violation of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*); (4) false and/or misleading labeling in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*); (5) engaging in unfair acts or practices in the conduct of trade or commerce in violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. State § 501.201, *et seq.*); and (6) breach of express warranty in violation of multi-state laws.

1.8     On February 27, 2015, Seventh Generation, Inc. filed a Motion to Transfer Venue of the Tsan Action to the United States District Court, Southern District of New York, White Plains Division.  This Motion was heard by the Honorable Jon S. Tigar on May 7, 2015.

1.9     On May 15, 2015, Seventh Generation, Inc. filed a FRCP 12(b)(6) Motion to Dismiss Plaintiff's Complaint in the Rapoport Action.  The Motion was set for hearing on January 28, 2016, before the Honorable Kenneth M. Karas.

1.10     On June 17, 2015, Judge Tigar issued an order denying Seventh Generation, Inc.'s Motion to Transfer Venue in the Tsan Action.

1.11     On July 6, 2015, Seventh Generation, Inc. filed a FRCP 12(b)(6) Motion to Dismiss Plaintiff's Complaint in the Tsan Action.  After being fully briefed, the Motion was taken under submission without oral argument before the Court.

1.12     On September 9, 2015, the parties entered into a stipulated Protective Order, issued by the Court in the Tsan Action.

1.13     On October 14, 2015, a further mediation session was held before Jed Melnick of JAMS in New York City between Defendant and Counsel for Plaintiffs Tsan and Wildstein. While a settlement was not reached, the Parties continued to discuss settlement while contemporaneously litigating the actions. Plaintiffs Tsan and Wildstein began conducting significant discovery, reviewing thousands of pages of documents and preparing for, and taking, a Rule 30(b)(6) deposition of Defendant in Burlington, VT.

1.14     On October 15, 2015, Sarah Hennessy, an attorney with Flaherty Hennessy LLP, sent a Notice of Violation of California Consumer Legal Remedies Act ("CLRA") letter on behalf of her client Tara Urban to Seventh Generation Inc. regarding the labeling and composition of its "Baby Free & Clear Wipes" product which the client had allegedly purchased, in alleged violation of California Civil Code section 1750, *et seq.*

1.15     On November 3, 2015, the Court issued an order granting Seventh Generation's Motion to Dismiss the Tsan Action solely with regard to the Magnuson Moss Warranty Act claim, and denied the Motion to Dismiss the Tsan Action regarding all other claims.

1.16     On November 11, 2015, Seventh Generation filed its Answer to Complaint in the Tsan Action. On January 28, 2016, Seventh Generation's Motion to Dismiss and Motion to Strike Class Allegations in the Rapoport-Hecht Action were heard before the Honorable Kenneth M. Karas.  Judge Karas issued a Minute Order reserving judgment in the Rapoport-Hecht Action.

1.17     On March 19, 2016, the parties in the Tsan Action entered into a Memorandum of Understanding regarding the proposed settlement of the nationwide actions.

1.18     Before entering into this Settlement Agreement, Plaintiffs' Counsel conducted an extensive and thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims, potential claims, and potential defenses asserted in this Action.  As part of that investigation, as well as through formal discovery, Plaintiffs' Counsel obtained tens of thousands of pages of documents and extensive information from SVG through confidential, informal and formal discovery, including information concerning marketing, label design, product formulation, sales, pricing, profit-and-loss information for the SVG Products, information regarding SVG's sales to grocery stores and other retailers, and Food and Drug Administration and other regulatory submissions.  Additionally, the Tsan Plaintiffs took a Fed. R. Civ. P. 30(b)(6) deposition of a representative of SVG.

1.19     This Agreement is the product of extensive, arms-length, and vigorously contested motion practice, settlement negotiations and an exchange of information: both informal and formal discovery, including production of documents and deposition relevant to the negotiation that spanned over a two-year period, from March 2014 to March 2016.  Two pre-filing sessions of mediation were held between Defendant SVG and Counsel for Plaintiffs Tsan and Wildstein on June 18, 2014 and September 8, 2014, before the Honorable Edward A. Infante (Ret.) of JAMS in San Francisco.  On October 14, 2015, a further mediation session was held before Jed Melnick of JAMS in New York City.  Following the last formal mediation session on October 2015, the Parties have spent the past six to seven months in continued settlement negotiations through phone conferences with and without the mediator Jed Melnick, and through

a written exchange of information and demands.  This Settlement Agreement was reached as a result of these hard-fought negotiations.

1.20    The Action has not been certified as a class action.  Subject to the approval of the Court, the Parties agree that a class may be conditionally certified for purposes of this Settlement.  SVG agrees to class-action treatment of the claims alleged in this Action solely for the purpose of compromising and settling those claims on a class basis as set forth herein.

1.21    Plaintiffs, as proposed Settlement Class representatives, believe the claims settled herein have merit.  Plaintiffs and their counsel recognize, however, the litigation risk involved, including the expense and length of continued proceedings necessary to prosecute the claims through trial and appeal, and have taken into account those factors, as well as the litigation's inherent difficulties and delays.  They believe the settlement set forth in this Agreement confers substantial benefits upon the Settlement Class Members.  They have evaluated the settlement set forth in this Agreement and have determined it as fair, reasonable, and adequate to resolve their grievances, and in the best interest of the Settlement Class.

1.22    SVG has denied, and continues to deny, that its marketing, advertising, and/or labeling of the SVG Products is false, deceptive, or misleading to consumers or violates any legal requirement.  SVG's willingness to resolve the Action on the terms and conditions embodied in this Agreement is based on, *inter alia*:  (i) the time and expense associated with litigating this Action through trial and any appeals; (ii) the benefits of resolving the Action, including limiting further expense, inconvenience, and distraction, disposing of burdensome litigation, and permitting SVG to conduct its business unhampered by the distractions of continued litigation; and (iii) the uncertainty and risk inherent in any litigation, regardless of legal merit.

1.23    This Agreement, any negotiations, proceedings, or documents related to this

Agreement, its implementation, or its judicial approval cannot be asserted or used by any person

to support a contention that class certification is proper or that liability does or does not exist, or

for any other reason, in the above-captioned action or in any other proceedings, *provided*,

*however*, that Settlement Class Members, Class Counsel, SVG, other related persons, and any

person or entity that is a beneficiary of a release set forth herein, may reference and file this

Agreement, and any resulting Order or Judgment, with the Court, or any other tribunal or

proceeding, in connection with the implementation or enforcement of its terms (including but not

limited to the releases granted therein or any dispute related thereto).

**THEREFORE**, in consideration of the mutual promises and covenants contained herein

and of the releases and dismissals of claims described below, the Parties agree to this Settlement,

subject to the Final Approval of the Court, upon the following terms and conditions set forth in

this Class Settlement Agreement.

## II.    DEFINITIONS

2.1    "Action" means the lawsuit styled as *Rapoport-Hecht, et al. v. Seventh

*Generation, Inc.*,4:14-cv-09087-KMK, United States District Court, Southern District of New

York.

2.2    "Agreement" or "Settlement" or "Settlement Agreement" means this Class

Settlement Agreement and its exhibits, attached hereto or incorporated herein, including any

subsequent amendments agreed to by the Parties and any exhibits to such amendments.

2.3    "Attorneys' Fees and Expenses" means such funds as the Court may award to

Class Counsel to compensate Class Counsel for the fees and expenses they have incurred or will

incur in connection with this Action and Settlement, as described in Section VIII of this

Agreement.  Attorneys' Fees and Expenses do not include any costs or expenses associated with the Class Notice or administration of the Settlement.

2.4     "Claim Form" means the document to be submitted by Claimants seeking payment pursuant to Section 4.2 of this Class Settlement Agreement.  The Claim Form will accompany the mailed Class Notice and will be available online at the Settlement Website, substantially in the form of Exhibit A to this Class Settlement Agreement.

2.5     "Claim Period" means the time period during which Settlement Class Members may submit a Claim Form to the Settlement Administrator for review.  The Claim Period shall run for a period of time ordered by the Court, and last at least one-hundred and twenty (120) calendar days from the date of the first publication of the Summary Settlement Notice or Class Notice, whether online, via print publication, or via press release, whichever is earlier.

2.6     "Claimant" means a Settlement Class Member who submits a claim for payment as described in Section 4.2 of this Class Settlement Agreement.

2.7     "Class Action Settlement Administrator," "Settlement Administrator," or "Notice Administrator" means, Angeion Group the company jointly selected by Class Counsel and SVG's Counsel and approved by the Court to provide Class Notice and to administer the claims process.

2.8     "Class Counsel" means Reese LLP, 100 West 93rd Street, 16th Floor, New York, NY 10025, Halunen Law, 80 South Eighth Street, Suite 1650, Minneapolis, MN 55402, Tycko & Zavareei LLP, 1828 L Street, NW, Suite 1000, Washington D.C. 20036 and The Sultzer Law Group, 85 Civic Center Plaza, Suite 104, Poughkeepsie, NY, 12601.

2.9     "Class Notice" or "Long-Form Notice" means the legal notice of the proposed Settlement terms, as approved by SVG's Counsel and Class Counsel, subject to approval by the

Court, to be provided to potential members of the Settlement Class pursuant to Section 5.1 below.  The Class Notice shall be substantially in the form attached hereto as Exhibit B.  Any changes to the Class Notice from Exhibit B must be jointly approved by Class Counsel and SVG's Counsel.

2.10    "Class Period" means the period from November 14, 2010, up to and including the date of the Court's Preliminary Approval Order.

2.11    "Complaints" mean the New York, California and Urban claims, each as amended.

2.12    "Court" means the United States District Court for the Southern District of New York or the Northern District of California, as appropriate.

2.13    "Effective Date" means:

(a)    if no appeal is taken from the Order and Final Judgment, thirty-five (35) days after the Court enters the Order and Final Judgment of this Class Settlement Agreement; or

(b)    if an appeal is taken from the Order and Final Judgment, the date on which all appellate rights (including petitions for rehearing or re-argument, petitions for rehearing *en banc*, petitions for certiorari or any other form of review, and proceedings in the United States Supreme Court or any other appellate court) have expired, been exhausted, or been finally disposed of in a manner that affirms the Order and Final Judgment.

2.14    "Final Approval" of this Class Settlement Agreement means the date that the Order and Final Judgment is entered in this Action approving this Class Settlement Agreement.

2.15    "Fund Institution" means a third-party banking institution where the cash funds SVG will pay under the terms of this Agreement will be deposited into a Qualified Settlement

Fund account, specifically, the Settlement Fund, as defined herein.  Pursuant to Section 4.1, Class Counsel will select the Fund Institution, and SVG will approve it.

2.16    "Incentive Award" means the amount the named plaintiffs, Plaintiffs Tsan, Wildstein and Rapoport-Hecht will receive for their service as class representatives, pursuant to Section 8.5.

2.17    "Initial Claim Amount" means the amount a Settlement Class Member claims as a cash payment on a Claim Form that is timely, valid, and approved by the Settlement Administrator.  The value basis of the Initial Claim Amount is described in Section 4.6.  The Initial Claim Amount is subject to *pro rata* increase or decrease, depending on the value of all approved Claims submitted, pursuant to Section 4.6.

2.18    "Notice Plan" means the plan for publication of Class Notice developed by the Settlement Claim Administrator, attached hereto as Exhibit C, Declaration of Steven Weisbrot with Respect to Settlement Notice Plan.

2.19    "Order and Final Judgment" means the final order to be entered by the Court approving the Settlement pursuant to the terms and conditions of this Agreement, dismissing the California and New York Actions with prejudice, releasing claims, and otherwise directing as the Court or the Parties deem necessary and appropriate to effectuate the terms and conditions of this Agreement.

2.20    "Preliminary Approval" means the order preliminarily approving the Class Settlement Agreement, preliminarily certifying the Settlement Class, approving the Notice of Proposed Settlement, and issuing any necessary related orders.

2.21    "Proof of Purchase" means a receipt or other documentation reasonably establishing the fact, date of purchase, and the price paid for a SVG Product during the Settlement Class Period in the United States.

2.22    "Qualified Settlement Fund" means the type of fund, account, or trust, created pursuant to 26 C.F.R. § 1.468B-1, that the Fund Institution will establish to receive payments under this Agreement.

2.23    "Related Actions" means any action filed, threatened to be filed, or filed in the future in other state or federal courts asserting claims and alleging facts substantially similar to those asserted and alleged in this Action, including but not limited to the threatened lawsuit by Tara Urban.

2.24    "Released Claims" means any claim, cross-claim, liability, right, demand, suit, matter, obligation, damage, restitution, disgorgement, loss or cost, attorney's fee or expense, action, or cause of every kind and description that any Plaintiff, the Settlement Class or any member thereof had or have, including assigned claims, whether in arbitration, administrative, or judicial proceedings, whether as individual claims, claims asserted on a class basis or on behalf of the general public, whether known or unknown, asserted or unasserted, suspected or unsuspected, latent or patent, that is, has been, could reasonably have been, or in the future might reasonably be asserted by Plaintiffs or members of the Settlement Class either in the Action or in any action or proceeding in this Court or in any other court or forum, including any Related Actions, regardless of legal theory or the law under which such action may be brought, and regardless of the type or amount of relief or damages claimed, against any of the Released Persons, arising out of or relating to the allegations in the Complaints or SVG's labeling, marketing, and advertising of the SVG Products as alleged in the Complaints.  This includes,

*inter alia*, and for the avoidance of doubt, all such claims that relate in any way to statements that are contained on the SVG Products or otherwise relate to the advertising, formulation, labeling, or marketing of the SVG Products as "natural," "hypoallergenic," or "non-toxic" and similar statements regarding the SVG Products through any medium (on-label, Internet, television, radio, print or otherwise).  Plaintiffs and the Settlement Class agree that the agreed modifications to the labeling, packaging, marketing, and advertising of the SVG Products set forth in Section 4.5 below are satisfactory to Plaintiffs and the Settlement Class and alleviate each and every alleged deficiency with regard to the advertising, formulation, labeling, packaging, advertising, and marketing of the SVG Products (and similar deficiencies, if any, with regard to other or future SVG products) set forth in or related to the Complaints and/or Related Actions.  For the avoidance of doubt, the term "Released Claims" includes only those claims that arise out of or relate to the allegations in the Complaints, Related Actions or SVG's advertising, formulation, labeling, marketing, and advertising of the SVG Products.

2.25     "Released Persons" means and includes SVG and each of its affiliated entities, subsidiaries, predecessors, and successors, suppliers, distributors, retailers, customers, and assigns, including the present and former directors, officers, employees, shareholders, agents, insurers, partners, privies, representatives, attorneys, accountants, and all persons acting by, through, under the direction of, or in concert with them.

2.26     "Residual Fund" means the value of funds remaining in the Settlement Fund, less all Claimants' Initial Claim Amounts; less Class Notice and administration costs; and less all Attorneys' Fees and Expenses and Incentive Awards pursuant to Court Order or otherwise specified in this Agreement.

2.27    "Settlement Amount" means Four Million Five Hundred Thousand Dollars and No Cents ($4,500,000.00).

2.28    "Settlement Class" or "Settlement Class Member" means all persons and entities who, during the Class Period, both resided in the United States and purchased in the United States any of the SVG Products for their household use or personal consumption and not for resale.  Excluded from the Settlement Class are: (a) SVG's board members or executive-level officers, including its attorneys; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Settlement Class in accordance with the procedures approved by the Court.

2.29    "Settlement Fund" means the Settlement Amount that SVG will pay or cause to be paid in cash to the Settlement Fund Institution to be used to pay Settlement Class Members who submit valid and timely Claim Forms, pursuant to Section 4.2.  The Settlement Fund will also be used to pay for any award of Attorneys' Fees and Expenses that the Court orders, any Class Notice and administration costs, Incentive Awards, and other costs pursuant to the terms of Section 4.1(a) of this Agreement.

2.30    "Settlement Hearing(s)" means the hearing the Court will hold to consider and determine whether it should approve the proposed settlement contained in this Class Settlement Agreement as fair, reasonable, and adequate, and whether it should enter Judgment approving the terms of the Class Settlement Agreement.  Settlement Hearings include both a "Preliminary Approval Hearing" and a "Final Approval Hearing" or "Fairness Hearing," to be held after preliminary approval is granted, as the Court so orders.

2.31    "Settlement Website" means the website to be created for this Settlement that will include information about the Action and the Settlement, relevant documents, and electronic and

printable forms relating to the Settlement, including the Claim Form.  The Settlement Website shall be activated by the date of the first publication of the Summary Settlement Notice or Class Notice, whichever is earlier, and shall remain active until one hundred and twenty (120) calendar days after the Court enters the Order and Final Judgment.

2.32    "Summary Settlement Notice" or "Short Form Notice" means the Summary Class Notice of proposed class action settlement, to be disseminated by publication substantially in the form of Exhibit D attached to this Agreement.  Any changes to the Summary Settlement Notice or Short Form Notice from the form set forth in Exhibit D must be jointly approved by Class Counsel and SVG's Counsel.

2.33    "SVG" or "Defendant" means Seventh Generation, Inc., a Vermont corporation with its principal place of business in Burlington, Vermont, and its predecessors, subsidiaries, shareholders, affiliates, officers, directors, partners, employees, agents, servants, assignees, successors, and/or other transferees or representatives.

2.34    "SVG's Counsel" means Mintz Levin Cohn, Ferris, Glovsky and Popeo, P.C., 44 Montgomery Street, 36th Floor, San Francisco, California 94104.

2.35    "Tally" or "Final Tally" means the calculation and report the Settlement Administrator shall provide to the Parties, which shall include the value, number, and type of timely, valid, and approved Claims.  The Final Tally shall also include the amount that Settlement Class Members timely and validly claimed.  The Settlement Administrator shall give the Final Tally to the Parties no later than seven (7) calendar days after the close of the Claim Period.

2.36    "SVG Products" means SVG's products as identified in Exhibit E.  The SVG Products include those certain SVG products purchased by Settlement Class Members during the

Class Period, as well as any of the SVG products that are purchased in the future, provided that there is no substantial change in their formulation or SVG's labeling, marketing or advertising of the SVG Products that would be material to the claims resolved in this Settlement Agreement and in contravention of Sections 4.5, 4.6 and 4.7 of this Agreement.

## III.   CERTIFICATION OF THE SETTLEMENT CLASS AND PRELIMINARY APPROVAL

3.1     For the purposes of settlement and the proceedings contemplated herein, the parties stipulate and agree that a nationwide Settlement Class should be certified.  Class certification shall be for settlement purposes only and shall have no effect for any other purpose.

3.2     The certification of the Settlement Class shall be binding only with respect to this Class Settlement Agreement.  In the event that the Effective Date does not occur for any reason, the Preliminary Approval, and all of its provisions, shall be vacated by its own terms, and this Action shall revert to its status that existed prior to the date of this Class Settlement Agreement.

3.3     As part of the settlement process, SVG consents to Plaintiffs' application to the Court for entry of an order which, among other things: (a) preliminarily certifies the Settlement Class in accordance with the definition set forth in Section 2.28 of this Class Settlement Agreement; (b) preliminarily approves this Agreement for purposes of issuing Class Notice; (c) approves the timing, content, and manner of the Class Notice and Summary Settlement Notice or Short Form Notice; (d) appoints the Settlement Administrator; (e) appoints Reese LLP, Halunen Law, Tycko & Zavareei LLP, and the Sultzer Law Group P.C. as Class Counsel and Plaintiffs Tsan, Wildstein and Rapoport-Hecht  as named Class Representatives; and (f) makes such orders as are necessary and appropriate to effectuate the terms and conditions of this Agreement.

**IV.    SETTLEMENT CONSIDERATION AND BENEFITS**

The settlement relief includes three components to benefit the Settlement Class:  (a) a Settlement Fund from which Settlement Class Members who submit timely, valid, and approved claims will obtain refunds; (b) modifications to the SVG Products labeling; and (c) modifications to the SVG Products website.

4.1    **Settlement Fund**

(a)    **Settlement Fund.**  SVG shall establish a Settlement Fund with a value of Four Million, Five Hundred Thousand Dollars and No Cents ($4,500,000.00).  SVG shall pay all cash payments due per Section 4.1(b) by paying this amount into a Qualified Settlement Fund at the Fund Institution.  The Settlement Fund shall be applied to pay in full and in the following order:

(i)    any necessary taxes and tax expenses;

(ii)    all costs and expenses associated with disseminating notice to the Settlement Class, including but not limited to, the Class Notice and Summary Settlement Notice;

(iii)    all costs and expenses associated with the administration of the Settlement, including but not limited to, processing claims and fees of the Class Action Settlement Administrator;

(iv)    any Attorneys' Fees and Expenses award made by the Court to Class Counsel pursuant to Section VIII of this Class Settlement Agreement;

(v)    any Incentive Award made by the Court to Plaintiffs under Section 8.5 of this Class Settlement Agreement;

(vi)    cash payments distributed to Settlement Class Members who have submitted timely, valid, and approved Claims pursuant to the Claims Process outlined in Section 4.2 and the Monetary Relief outlined in Section 4.3 of this Agreement; and

16

(vii)    the Residual Funds, if any, pursuant to Section 4.4(c) of this Agreement.

(b)    SVG's Funding of the Settlement Fund.

(i)    Within ten (10) days of Preliminary Approval, SVG must fund costs associated with carrying out the Notice Plan.

(ii)    Within thirty-five (35) calendar days after the entry of Final Approval, SVG shall fund the Settlement Fund with the entire Settlement Amount, less any amount previously funded pursuant to 4.1(b)(i).  This thirty-five-day deadline may be extended by mutual consent of the Parties.

(c)    Class Counsel must approve any payment of costs or expenses under Sections 4.1(a)(i), 4.1 (a)(ii), and 4.1(a)(iii).

(d)    In no circumstances shall SVG's contribution to the Settlement Fund exceed Four Million, Five Hundred Thousand Dollars and No Cents ($4,500,000.00).  Thus, under this Settlement Agreement, the Parties agree that the Settlement Fund encompasses the full extent of SVG's monetary payment due under this Agreement.  These payments, pursuant to the terms and conditions of this Agreement, and any other non-monetary obligations of and considerations due from SVG set forth in this Agreement, will be in full satisfaction of all individual and class claims asserted in or that could have been asserted in this Action.

(e)    SVG and the Released Parties are not obligated (and will not be obligated) to compute, estimate, or pay any taxes on behalf of Plaintiffs, Plaintiffs' Counsel, Class Counsel, any Settlement Class Member, the Notice Administrator, or the Settlement Administrator.

(f)     In the event the Effective Date does not occur, all amounts paid into the Settlement Fund, less amounts incurred for claims administration and notice, shall be promptly returned to SVG.

4.2     **Eligibility and Process for Obtaining a Cash Payment**

To be eligible for a cash payment, a Settlement Class Member must submit a timely and valid Claim Form, which will be evaluated by the Settlement Administrator.

(a)     **Claim Form Availability.**  The Claim Form shall be in a substantially similar form to that attached as Exhibit A.  The Claim Form will be: (i) included on the Settlement Website to be designed and administered by the Settlement Administrator, and Class Members shall be allowed to complete the Claim Form online; (ii) made readily available from the Settlement Administrator, including by requesting a Claim Form from the Settlement Administrator by mail, e-mail, or calling a toll-free number provided by the Settlement Administrator; and (iii) mailed to those individuals who have directly bought SVG Products from www.seventhgeneration.com.  The Claim Form will be available for downloading on Class Counsel's website, at Class Counsel's option.

(b)     **Timely Claim Forms.**  Settlement Class Members must submit a timely Claim Form, which is one postmarked or submitted online before or on the last day of the Claim Period, the specific date of which will be prominently displayed on the Claim Form and Class Notice.  For a non-online Claim Form, the Claim Form will be deemed to have been submitted on the date of the postmark on the envelope or mailer.  For an online Claim Form and in all other cases, the Claim Form will be deemed to have been submitted on the date it is received by the Settlement Administrator.

(c)     **Validity of Claim Forms.**  Settlement Class Members must submit a valid Claim Form, which must contain the Settlement Class Member's name and mailing address, attestation of purchase(s) as described in Section 4.2(d), type(s) and number of SVG Products purchased, and approximate dates of purchase. Subject to Section 4.2(g) herein, Claim Forms that do not meet the requirements set forth in this Agreement and in the Claim Form instructions may be rejected.  The Settlement Administrator will determine a Claim Form's validity.  Where a good faith basis exists, the Settlement Administrator may reject a Settlement Class Member's Claim Form for, among other reasons, the following:

(i)     Failure to attest to the purchase of the SVG Products, or purchase of products that are not covered by the terms of this Settlement Agreement;

(ii)     Failure to provide adequate verification or additional information of the Claim pursuant to a request of the Settlement Administrator;

(iii)     Failure to fully complete and/or sign the Claim Form;

(iv)     Failure to submit a legible Claim Form;

(v)     Submission of a fraudulent Claim Form;

(vi)     Submission of Claim Form that is duplicative of another Claim Form;

(vii)     Submission of Claim Form by a person who is not a Settlement Class Member;

(viii)     Request by person submitting the Claim Form to pay funds to a person or entity that is not the Settlement Class Member for whom the Claim Form is submitted;

(ix)     Failure to submit a Claim Form by the end of the Claim Period; or

(x)     Failure to otherwise meet the requirements of this Agreement.

19

(d)     **Attestation of Purchase Under Penalty of Perjury Required.**  For claims without proof of purchase, each Settlement Class Member shall sign and submit a Claim Form that states to the best of his or her knowledge the total number and type of purchased SVG Products, and approximate date of his or her purchases.  The Claim Form shall be signed under an affirmation stating the following or substantially similar language: "I declare, under penalty of perjury, that the information in this Claim Form is true and correct to the best of my knowledge, and that I purchased the SVG Product(s) claimed above during the Class Period for personal or household use and not for resale.  I understand that my Claim Form may be subject to audit, verification, and Court review."

(e)     **Verification of Purchase May Be Required.**  The Claim Form shall advise Settlement Class Members that while proof of purchase is not required to submit a Claim, the Settlement Administrator has the right to request verification or more information regarding the purchase of the SVG Products for the purpose of preventing fraud.  If the Settlement Class Member does not timely comply or is unable to produce documents or additional information to substantiate the information on the Claim Form and the Claim is otherwise not approved, the Settlement Administrator may disqualify the Claim.

(f)     **Claim Form Submission and Review.**  Claimants may submit a Claim Form either by mail or electronically.  The Settlement Administrator shall review and process the Claim Forms pursuant to the process described in this Agreement to determine each Claim Form's validity.  Adequate and customary procedures and standards will be used by the Settlement Administrator to prevent the payment of fraudulent claims and to pay only legitimate claims.  The Parties shall take all reasonable steps, and direct the Settlement Administrator to take all reasonable steps, to ensure that Claim Forms completed and signed electronically by

20

Settlement Class Members conform to the requirements of the federal Electronic Signatures Act, 15 U.S.C. § 7001, *et seq*.

(g)    **Claim Form Deficiencies.**  Failure to provide all information requested on the Claim Form will not result in immediate denial or nonpayment of a claim.  Instead, the Settlement Administrator will take all reasonable and customary steps to attempt to cure the defect and to determine the Settlement Class Member's eligibility for payment and the amount of payment based on the information contained in the Claim Form or otherwise submitted, including but not limited to attempting to follow up with the Claimant to gather additional information if necessary.  If the Claim Form defect is not cured, the Claim will be rejected.  SVG is entitled to dispute claims if available records or other information indicate that the information on the Claim Form is inaccurate or incomplete, but determination by Settlement Administrator will be final.

(h)    **Failure to Submit Claim Form.**  Unless a Settlement Class Member opts out pursuant to Section VI, any Settlement Class Member who fails to submit a timely and valid Claim Form shall be forever barred from receiving any payment pursuant to this Agreement, and shall in all other respects be bound by all of the terms of this Agreement and the terms of the Order and Final Judgment to be entered in the Action.  Based on the Release contained in the Agreement, any Settlement Class Member who does not opt out will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning any of the matters subject to the Release.

(i)    **Settlement – Class Members' Cash Recovery**.  The relief to be provided to each Settlement Class Member who submits a timely a valid Claim Form pursuant to the terms and conditions of this Agreement shall be a payment in the form of a cash refund.  The amount

21

of the payment will vary based on: (i) the type (or value) of the SVG Products that the Settlement Class Member purchased; (ii) whether the Settlement Class Member submit valid Proof of Purchase; (iii) whether the Settlement Class Member submits a valid Claim Form for all qualifying purchases; and (iv) the total amount of valid claims submitted. Cash refunds will be paid by the Settlement Administrator pursuant to Section 4.3, via check.

      (j)   **Monetary Relief for Settlement Class**.

      (i)   <u>Proof of Purchase</u>: Claimants with Proof of Purchase may obtain reimbursement of the purchase price stated on the receipt with no cap or limit. The Initial Claim Amount depends on the number and type, or value, of SVG Products purchased per the Proof of Purchase provided and is subject to a *pro rata* upward or downward adjustment pursuant to Section 4.4

      (ii)   <u>Without Proof of Purchase</u>: Class members who wish to file a claim that includes purchases of SVG Products for which they are unable to provide Proof of Purchase, may seek reimbursement for 50% of the average purchase price of each SVG Product, up to 10 SVG Products. For purposes of determining the average purchase price of each SVG Product, the Parties agree that the average prices of the SVG Products range from $3.36 to $29.26, depending on the SVG Product purchased and are provided in Exhibit E. On the Claim Form, a Settlement Class Member must state the type of SVG Product(s) purchased and the number of SVG Product(s) purchased during the Class Period. The Initial Claim Amount depends on the number and type, or value, of SVG Products purchased, and is subject to a *pro rata* upward or downward adjustment pursuant to Section 4.4.

4.3     **Distribution to Authorized Settlement Class Members**

(a)     The Settlement Administrator shall begin paying timely, valid, and approved Claims via first-class mail no later than thirty (30) calendar days after the Effective Date.  The Settlement Administrator may begin to pay timely, valid, and approved Claims sooner upon SVG and Class Counsel's joint direction, but not before the Effective Date.

(b)     The Settlement Administrator shall have completed the payment to Settlement Class Members who have submitted timely, valid, and approved Claims pursuant to the Claim Process no later than sixty (60) calendar days after the Effective Date.

4.4     **Excess or Insufficient Funds in the Settlement Fund**

(a)     **Excess Funds.**  If, after the payment of all valid Claims, Notice and Administration costs, Attorneys' Fees and Expenses, Incentive Awards, and any other claim, cost, or fee specified by this Agreement, value remains in the Settlement Fund, it shall be called the Residual Fund.  Any value remaining in the Residual Fund shall increase eligible Settlement Class Members' relief on a *pro rata* basis such that Settlement Class Members are entitled to receive an increased payment constituting up to one hundred percent (100%) of the Eligible Settlement Class Member's Initial Claim Amount.  The Settlement Administrator shall determine each authorized Settlement Class member's *pro rata* share based upon each Settlement Class Member's Claim Form and the total number of valid Claims.  Accordingly, the actual amount recovered by each Settlement Class Member will not be determined until after the Claim Period has ended and all Claims have been calculated.

(b)     **Insufficient Funds.**  If the total amount of the timely, valid, and approved Claims submitted by Settlement Class Members exceeds the funds available, considering any fees, payments, and costs set forth in this Agreement that must also be paid from the Settlement

Fund, each eligible Settlement Class Member's Initial Claim Amount shall be proportionately reduced on a *pro rata* basis, such that the aggregate value of the cash payments distributed does not exceed the Settlement Fund Balance after payment of all other costs.  The Settlement Administrator shall determine each authorized Settlement Class member's *pro rata* share based upon each Settlement Class Member's Claim Form and the total number of valid Claims. Accordingly, the actual amount recovered by each Settlement Class Member will not be determined until after the Claim Period has ended and all Claims have been calculated.

(c)     It is the Parties intent to distribute all Settlement Funds to Settlement Class Members.  However, if there are any funds remaining in the Settlement Fund Balance following the calculation pursuant to the above Sections 4.4(a) or (b), including any checks that were not cashed, then the Settlement Administrator shall distribute the Residual Funds to the following non-profit organizations in equal shares: Center for Science in the Public Interest and National Consumer Law Center. Affidavits from the Center for Science in the Public Interest and National Consumer Law Center are attached as Exhibits F and G. The Residual Funds will not be returned to SVG.  SVG represents and warrants that any payment of Residual Funds to any charities, non-profit organizations, or government entities shall not reduce any of its donations or contributions to any entity, charity, charitable foundation or trust, and/or non-profit organization.

4.5     **Injunctive Relief: Modification of SVG Products' Labels and Website**

SVG agrees to make the modifications described below to its labeling on its SVG Products and on its website, beginning within ninety (90) days after the Effective Date, but shall be able to continue to utilize existing labels and materials and sell existing inventory.  SVG agrees to modify the content of the SVG website, www.seventhgeneration.com, to correspond to the labeling changes.

24

SVG will not use "All Natural" or "100% Natural" on its product label.  Any product label using the word "Natural" will:

    a.  Continue to use a biobased seal or biobased content disclosure on product labeling with percentage of biobased ingredients used pursuant to that program's specifications on the front or back label panels, space permitting and where appropriate;

    b.  List ingredients on product labels; and provide ingredient information, including origin (plant-derived or synthetic) and function (*e.g.,* preservative) on SVG's website;

    c.  Notwithstanding a and b above, abide by industry or regulatory labeling standards where applicable, now in existence or that which may be employed in the future; and

    d.  To the extent that SVG continues to use Mehtylisothiasolinone ("MIT") or Benzisothiazolinone ("BIT") in any of the Products, it will include a disclosure on the Seventh Generation website that "hypoallergenic," "non-toxic," or similar statements on the packaging or advertising for such Products does not mean that a product or ingredient will not cause any allergic reaction or irritation in any person, and that a small percentage of individuals may have some form of allergic reaction or irritation to MIT or BIT.

### 4.6    <u>Other Injunctive Relief Terms and Conditions</u>

    (a)    Plaintiffs and the Settlement Class agree that the agreed modifications to the labeling, marketing, and advertising of the SVG Products are satisfactory to Plaintiffs and the Settlement Class and alleviate each and every alleged deficiency with regard to the labeling, packaging, advertising, and marketing of the SVG Products and their ingredients (and similar deficiencies, if any, with regard to other or future SVG products) set forth in or related to the Complaints, Related Actions or otherwise.

    (b)    **Expiration.**  The injunctive relief requirements by which SVG agrees to abide as part of this Settlement Agreement and as described in Sections 4.5 and 4.6 shall expire on the earliest of the following dates: (i) the date upon which there are changes to any applicable

statute, regulation, pronouncement, guidance, or other law that SVG reasonably believes would require a modification to any of the SVG Product labeling in order to comply with the applicable statute, regulation, pronouncement, guidance, or other law; or (ii) the date upon which there are any changes to any applicable federal or state statutes or regulations that would allow SVG to label its SVG Products "natural" without the labeling modifications set forth in this Agreement, including but not limited to changes in U.S. Food and Drug Administration ("FDA"), Federal Trade Commission, U.S. Department of Agriculture, U.S. Environmental Protection Agency, and other governmental agencies' regulations, guidance, or pronouncements.

    4.7    **Permitted Conduct**

    (a)    Subject to the requirements to modify its labeling and marketing of the SVG Products set forth in this Agreement, SVG shall be permitted to label, market, and advertise its Products using the following language: "natural," "hypoallergenic" and/or "non-toxic."

    (b)    Nothing in this Agreement shall prohibit or limit SVG's right or ability to use or permit others to use, in accordance with all applicable laws and regulations, its licenses, logos, taglines, product descriptors, or registered trademarks.

    (c)    Nothing in this Agreement shall preclude SVG from making claims in accordance with applicable FDA, FTC and EPA regulations.

    (d)    The Parties specifically acknowledge that product packaging often changes.  Nothing in this Agreement shall require SVG to continue to use the trademarks, taglines, and descriptions of its products, and nothing in this Agreement shall preclude SVG from making further disclosures or any labeling, marketing, advertising, or packaging changes that (i) SVG reasonably believes are necessary to comply with any changes to any applicable statute, regulation, pronouncement, guidance, or other law of any kind (including but not limited

to the Federal Food, Drug and Cosmetic Act, FDA regulations, U.S. Department of Agriculture regulations, Federal Trade Commission regulations, U.S. Environmental Protection Agency regulations and/or the California Sherman Food, Drug, and Cosmetic Law); (ii) are necessitated by product changes and/or reformulations to ensure that SVG provides accurate product descriptions; or (iii) do not materially differ from the taglines and product descriptions agreed to in this Agreement.

## V.    NOTICE TO CLASS AND ADMINISTRATION OF PROPOSED SETTLEMENT

### 5.1    <u>Duties and Responsibilities of the Settlement Administrator</u>

Class Counsel and SVG recommend and retain Angeion Group to be the Settlement Administrator for this Agreement.  The Settlement Administrator shall abide by and shall administer the Settlement in accordance with the terms, conditions, and obligations of this Agreement and the Orders issued by the Court in this Action.

(a)    **Class Notice Duties.**  The Settlement Administrator shall, in cooperation with the Parties, be responsible for consulting on and designing the Class Notice, Summary Class Notice, and Claim Form.  After the Court's Preliminary Approval of this Agreement and Appointment of the Settlement Administrator, the Settlement Administrator shall also be responsible for disseminating the Class Notice, substantially in the form as described in the Notice Plan attached as Exhibit C to this Agreement, as specified in the Preliminary Approval Order, and as specified in this Agreement.  The Class Notice and Summary Class Notice will comply with all applicable laws, including, but not limited to, the Due Process Clause of the Constitution.  Class Notice duties include, but are not limited to:

(i)    consulting on, drafting, and designing the Class Notice, Summary Class Notice, and Claim Form.  Class Counsel and SVG's Counsel shall have input and joint

27

approval rights, which shall not be unreasonably withheld, over these Notices and Form or any changes to the Notices and Form;

(ii)        developing a Notice Plan, attached as Exhibit C to this Agreement. Class Counsel and SVG's Counsel shall have input and joint approval rights, which shall not be unreasonably withheld, over this Notice Plan or changes to this Notice Plan;

(iii)        implementing and arranging for the publication of the Summary Settlement Notice and Class Notice via various forms of paper and electronic media, including implementing media purchases, all in substantial accordance with the Notice Plan, attached as Exhibit C.  To the extent that the Settlement Administrator believes additional or different Notice should be undertaken than that provided for in the Notice Plan, Class Counsel and SVG's Counsel shall have input and joint approval rights, which shall not be unreasonably withheld, over any additional or different Notice;

(iv)        establishing and publishing a website that contains the Class Notice and related documents, including a Claim Form capable of being completed and submitted on-line.  The website, including the Class Notice, shall remain available for 120 days after the Effective Date;

(v)        sending the Class Notice and related documents, including a Claim Form, via electronic mail or regular mail, to any potential Settlement Class Member who so requests and sending such Class Notice and documents to the list of direct consumers provided by SVG;

(vi)        responding to requests from Class Counsel and SVG's Counsel; and

(vii)    otherwise implementing and assisting with the dissemination of the Notice of the Settlement.

(b)    **Class Action Fairness Act Notice Duties to State and Federal Officials.** No later than ten (10) calendar days after this Agreement is filed with the Court, SVG shall mail or cause the items specified in 28 U.S.C. § 1715(b) to be mailed to each State and Federal official, as specified in 28 U.S.C. § 1715(a).

(c)    **Claims Process Duties.**  The Settlement Administrator shall be responsible for implementing the terms of the Claim Process and related administrative activities, including communications with Settlement Class Members concerning the Settlement, Claim Process, and the options they have.  Claims Process duties include, but are not limited to:

(i)    executing any mailings required under the terms of this Agreement;

(ii)    establishing a toll-free voice response unit to which Settlement Class Members may refer for information about the Action and the Settlement;

(iii)    establishing a post office box for the receipt of Claim Forms, exclusion requests, and any correspondence;

(iv)    receiving and maintaining on behalf of the Court all correspondence from any Settlement Class Member regarding the Settlement, and forwarding inquiries from Settlement Class Members to Class Counsel or their designee for a response, if warranted; and

(v)    receiving and maintaining on behalf of the Court any Settlement Class Member correspondence regarding any opt-out requests, exclusion forms, or other requests to exclude himself or herself from the Settlement, and providing to Class Counsel and SVG's

29

Counsel a copy within five (5) calendar days of receipt.  If the Settlement Administrator receives

any such forms or requests after the deadline for the submission of such forms and requests, the

Settlement Administrator shall promptly provide Class Counsel and SVG's Counsel with copies.

        (d)    **Claims Review Duties.**  The Settlement Administrator shall be

responsible for reviewing and approving Claim Forms in accordance with this Agreement.

Claims Review duties include, but are not limited to:

        (i)    reviewing each Claim Form submitted to determine whether each

Claim Form meets the requirements set forth in this Agreement and whether it should be

allowed, including determining whether a Claim by any Settlement Class Member is timely,

complete, and valid;

        (ii)    working with Settlement Class Members who submit timely claims

to try to cure any Claim Form deficiencies;

        (iii)    using all reasonable efforts and means to identify and reject

duplicate and/or fraudulent claims, including, without limitation, maintaining a database of all

Claims Form submissions;

        (iv)    keeping an accurate and updated accounting via a database of the

number of Claim Forms received, the amount claimed on each Claim Form, the name and

address of the Settlement Class Members who made the claim, the type of claim made, whether

the claim has any deficiencies, and whether the claim has been approved as timely and valid; and

        (v)    otherwise implementing and assisting with the Claim review

process and payment of the Claims, pursuant to the terms and conditions of this Agreement.

        (e)    **Periodic Updates.**  The Settlement Administrator shall provide periodic

updates to Class Counsel and SVG's Counsel regarding Claim Form submissions beginning

within seven (7) business days after the commencement of the dissemination of the Class Notice

or the Summary Settlement Notice and continuing on a monthly basis thereafter and shall

provide such an update within ten (10) days before the Final Approval Hearing.  The Settlement

Administrator shall also provide such updates to Class Counsel or SVG's Counsel upon request,

within a reasonable amount of time.

(f)      **Claims Payment Duties.**  The Settlement Administrator shall be

responsible for sending payments to all eligible Settlement Class Members with valid, timely,

and approved Claims pursuant to the terms and conditions of this Agreement.  Claim Payment

duties include, but are not limited to:

(i)      Within seven (7) days of the Effective Date, provide a report to

Class Counsel and SVG's Council calculating the amount and number of valid and timely claims

that requested refunds, including any to be paid pursuant to the Residual Funds described in

Section 4.4(c);

(ii)      Per Sections 4.3, 4.4, and 4.5, once the Settlement Fund has been

funded, sending refund checks to Settlement Claim Members who submitted timely, valid, and

approved Claim Forms;

(iii)      Once refund payments have commenced to the Settlement Class

pursuant to the terms and conditions of this Agreement, the Settlement Administrator shall

provide a regular accounting to Class Counsel and SVG's Counsel that includes but is not

limited to the number and the amount of claims paid.

(g)      **Reporting to Court.**  Not later than ten (10) calendar days before the date

of the Fairness Hearing, the Settlement Administrator and Notice Administrator shall file a

declaration or affidavit with the Court that: (i) includes a list of those persons who have opted

out or excluded themselves from the Settlement; and (ii) describes the scope, methods, and results of the notice program.

(h)     **Duty of Confidentiality.**  The Settlement Administrator shall treat any and all documents, communications, and other information and materials received in connection with the administration of the Settlement as confidential and shall not use or disclose any or all such documents, communications, or other information to any person or entity, except to the Parties or as provided for in this Agreement or by Court Order.

(i)     **Right to Inspect.**  Class Counsel and SVG's Counsel shall have the right to inspect the Claim Forms and supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

(j)     **Failure to Perform.**  If the Settlement Administrator misappropriates any funds from the Administration or Settlement Funds or makes a material or fraudulent misrepresentation to, or conceals requested material information from, Class Counsel, SVG, or SVG's Counsel, then the Party who discovers the misappropriation or concealment or to whom the misrepresentation is made shall, in addition to any other appropriate relief, have the right to demand that the Settlement Administrator immediately be replaced.  If the Settlement Administrator fails to perform adequately on behalf of the Parties, the Parties may agree to remove the Settlement Administrator.  Neither Party shall unreasonably withhold consent to remove the Settlement Administrator.  The Parties will attempt to resolve any disputes regarding the retention or dismissal of the Settlement Administrator in good faith.  If unable to so resolve a dispute, the Parties will refer the matter to the Court for resolution.

## VI.     OBJECTIONS AND REQUESTS FOR EXCLUSION

6.1     A Settlement Class Member may either object to this Agreement pursuant to Section 6.2 or request exclusion from this Agreement pursuant to Section 6.3.

6.2     Settlement Class Members shall have the right to object to this settlement and to appear and show cause, if they have any reason why the terms of this Agreement should not be given Final Approval, pursuant to this paragraph:

(a)     A Settlement Class Member may object to this Agreement either on his or her own without an attorney, or through an attorney hired at his or her own expense.

(b)     Any objection to this Agreement must be in writing, signed by the Settlement Class Member (and his or her attorney, if individually represented), filed with the Court, with a copy delivered to Class Counsel and Defense Counsel at the addresses set forth in the Class Notice, no later than 30 days before the Fairness Hearing.

(c)     Any objection regarding or related to this Agreement shall contain a caption or title that identifies it as "Objection to Class Settlement in *Tziva Rapoport-Hecht, et al. v. Seventh Generation, Inc.,* (S.D.N.Y. No. 14-CIV-9087-KMK)."

(d)     Any objection regarding or related to this Agreement shall contain information sufficient to identify and contact the objecting Settlement Class Member (or his or her individually-hired attorney, if any), as well as a clear and concise statement of the Settlement Class Member's objection, the facts supporting the objection, and the legal grounds on which the objection is based.

(e)     Any objection shall include documents sufficient to establish the basis for the objector's standing as a Settlement Class Member, such as (i) a declaration signed by the objector under penalty of perjury, with language similar to that included in the Claim Form attached hereto as Exhibit A, that the Settlement Class Member purchased at least one SVG Product during the Class Period of November 14, 2010 to the date of Preliminary Approval; or (ii) receipt(s) reflecting such purchase(s).

33

(f)     Class Counsel shall have the right and SVG shall reserve its right to respond to any objection no later than seven (7) days prior to the Fairness Hearing.  The Party so responding shall file a copy of the response with the Court, and shall serve a copy, by regular mail, hand or overnight delivery, to the objecting Settlement Class Member or to the individually-hired attorney for the objecting Settlement Class Member; to all Class Counsel; and to SVG's Counsel.

(g)     If an objecting Settlement Class Member chooses to appear at the hearing, no later than Fifteen (15) days before the Fairness Hearing, a Notice of Intention to Appear, either In Person or Through an Attorney, must be filed with the Court and list the name, address and telephone number of the attorney, if any, who will appear.

6.3     **Requests for Exclusion.**  Settlement Class Members shall have the right to elect to exclude themselves, or "opt out," of the monetary portion of this Agreement, relinquishing their rights to cash compensation under this Agreement and preserving their claims for damages that accrued during the Class Period, pursuant to this paragraph:

(a)     A Settlement Class Member wishing to opt out of this Agreement must send to the Class Action Settlement Administrator by U.S.  Mail a personally-signed letter including his or her name and address, and providing a clear statement communicating that he or she elects to be excluded from the Settlement Class.

(b)     Any request for exclusion or opt out must be postmarked on or before the opt-out deadline date specified in the Preliminary Approval Order.  The date of the postmark on the return-mailing envelope shall be the exclusive means used to determine whether a request for exclusion has been timely submitted.

(c)     The Class Action Settlement Administrator shall forward copies of any written requests for exclusion to Class Counsel and SVG's Counsel, and shall file a list reflecting all requests for exclusion with the Court no later than ten (10) calendar days before the Settlement Hearing.

(d)     The Request for Exclusion must be personally signed by the Settlement Class Member.

6.4     Any Settlement Class Member who does not file a timely written request for exclusion as provided in the preceding Section 6.3 shall be bound by all subsequent proceedings, orders, and judgments, including, but not limited to, the Release in this Action, even if he or she has litigation pending or subsequently initiates litigation against SVG relating to the claims and transactions released in this Action.

6.5     Any Settlement Class Member who does not request exclusion from the Settlement has the right to object to the Settlement.  Settlement Class Members may not both object and opt out of the Settlement.  Any Settlement Class Member who wishes to object must timely submit an objection as set forth in Section 6.2 above.  If a Settlement Class Member submits both an objection and a written request for exclusion, he or she shall be deemed to have complied with the terms of the procedure for requesting exclusion as set forth in Section 6.3 and shall not be bound by the Agreement if approved by the Court and the objection will not be considered by the Court.

## VII.   RELEASES

7.1     Upon the Effective Date of this Class Settlement Agreement, Plaintiffs and each member of the Settlement Class, and each of their successors, assigns, heirs, and personal representatives, shall be deemed to have, and by operation of the Order and Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims

against the Released Persons.  The Released Claims shall be construed as broadly as possible to effect complete finality over this litigation involving the advertising, labeling, and marketing of the SVG Products as set forth herein.

7.2     In addition, with respect to the subject matter of this Action, by operation of entry of the Final Order and Judgment, Plaintiffs Tsan, Wildstein and Rapoport-Hecht and each member of the Settlement Class, and each of their respective successors, assigns, legatees, heirs, and personal representatives, expressly waive any and all rights or benefits they may now have, or in the future may have, under any law relating to the releases of unknown claims, including, without limitation, Section 1542 of the California Civil Code, which provides:

> A General Release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

In addition to the foregoing, by operation of entry of the Final Order and Judgment, Plaintiffs and each member of the Settlement Class shall be deemed to have waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or any foreign country, and any and all principles of common law that are similar, comparable, or equivalent in substance or intent to Section 1542 of the California Civil Code.

7.3     Plaintiffs fully understand that the facts upon which this Class Settlement Agreement is executed may hereafter be other than or different from the facts now believed by Plaintiffs and Class Counsel to be true and nevertheless agree that this Class Settlement Agreement and the Release shall remain effective notwithstanding any such difference in facts.

36

7.4     To the extent permitted by law, this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, or attempted in breach of or contrary to this Agreement, including but not limited to any Related Actions.

## VIII.   ATTORNEYS' FEES AND EXPENSES AND CLASS REPRESENTATIVE INCENTIVE AWARDS

8.1     Class Counsel agrees to make and SVG agrees not to oppose, an application for an award of Attorneys' Fees and Expenses in the Action that will not exceed an amount equal to Thirty-Three percent (33%) of the Settlement Fund of $4,500,00.00.  This shall be paid from the Settlement Fund and shall be the sole aggregate compensation paid by SVG for Class Counsel representing the Class.  The ultimate award of Attorneys' Fees and Expenses will be determined by the Court.

8.2     Class Counsel, in their sole discretion, shall allocate and distribute the Court's award of fees and expenses.  Class counsel shall indemnify SVG and its attorneys against any third party action relating to attorneys' fees and expenses.

8.3     Class Counsel agrees that any award of Attorneys' Fees and Expenses will be sought solely and exclusively in the Action.  Class Counsel agrees that they will not seek or accept more than One Million Five Hundred and Thousand Dollars and No cents ($1,500,000.00) in Attorneys' Fees and Expenses.

8.4     SVG will not appeal from any order with respect to the award of Attorneys' Fees and Expenses provided that the order does not award Attorneys' Fees and Expenses in excess of the amount stated in Section 8.1.  SVG shall have the right to appeal in the event of an award of Attorneys' Fees and Expenses in excess of such amount.  SVG shall also have the right to

withdraw from the settlement in the event of an award of Attorneys' Fees and Expenses in excess of such amount.

8.5     Within thirty-five (35) days after the entry of the Final Approval, the Notice Administrator shall cause the Attorneys' Fees and Expenses awarded by the Court to be paid to Class Counsel as directed by Class Counsel. In the event the Effective Date does not occur, all amounts paid to Class Counsel as Attorney's Fees and Expenses awarded by the Court, shall be promptly returned to SVG.

8.6     Within five (5) days after the Effective Date, the Settlement Fund shall pay Incentive Awards of Five Thousand Dollars and No Cents ($5,000.00) to each of the named plaintiffs Tsan, Wildstein and Rapoport-Hecht.

## IX.   NO ADMISSION OF LIABILITY

9.1     SVG has denied and continues to deny that the labeling, advertising, or marketing of its SVG Products is false, deceptive, or misleading to consumers or violates any legal requirement, including but not limited to the allegations that SVG engaged in unfair, unlawful, fraudulent, or deceptive trade practices, breached an express warranty, or was unjustly enriched. SVG is entering into this Class Settlement Agreement solely because it will eliminate the uncertainty, distraction, burden, and expense of further litigation.  The provisions contained in this Class Settlement Agreement and the manner or amount of relief provided to Settlement Class Members herein shall not be deemed a presumption, concession, or admission by SVG of any fault, liability, or wrongdoing as to any facts or claims that have been or might be alleged or asserted in the Action, or in any other action or proceeding that has been, will be, or could be brought, and shall not be interpreted, construed, deemed, invoked, offered, or received into evidence or otherwise used by any person in any action or proceeding, whether civil, criminal, or administrative, for any purpose other than as provided expressly herein.

9.2     In the event that the Court does not approve this Class Settlement Agreement substantially in the form submitted (or in a modified form mutually acceptable to the Parties), or this Class Settlement Agreement is terminated or fails to become effective or final in accordance with its terms, the Plaintiffs and SVG shall be restored to their respective positions in the Action as of the date hereof.  In such event, the terms and provisions of this Class Settlement Agreement shall have no further force and effect and shall not be used in the Action or in any other proceeding or for any purpose, and the Parties will jointly make an application requesting that any Judgment entered by the Court in accordance with the terms of this Class Settlement Agreement shall be treated as vacated, *nunc pro tunc*.

9.3     By entering into this Class Settlement Agreement, SVG is not consenting to or agreeing to certification of the Settlement Class for any purpose other than to effectuate the settlement of the Action.  The parties agree that if the Court does not approve this Class Settlement Agreement substantially in the form submitted (or in a modified form mutually acceptable to the Parties), including, without limitation, if the Court grants a fee application that would cause the total award for Attorneys' Fees and Expenses to exceed One Million Five Hundred Thousand Dollars and No Cents ($1,500,000.00), or if this Class Settlement Agreement is terminated or fails to become effective or final in accordance with its terms, the Action shall proceed as if no Party had ever agreed to such settlement, without prejudice to the right of any Party to take any and all action of any kind in the Action.

## X.     ADDITIONAL PROVISIONS

10.1     Plaintiffs and Class Counsel warrant and represent to SVG that they have no intention of initiating any other claims or proceedings against SVG, or any of its affiliates, or any entity that manufactures, distributes, or sells SVG Products or any other product that is marketed or labeled using the SVG brand name, and, except for the claims hereby settled, Plaintiffs and

Class Counsel warrant and represent to SVG that they have no present knowledge and are not presently aware of any factual or legal basis for any such claims or proceedings, other than claims or proceedings that may already be pending against SVG.

10.2    The Parties agree that information and documents exchanged in negotiating this Settlement Agreement were done so pursuant to Fed.  R.  Evid.  408, and no such confidential information exchanged or produced by either side may be used for or revealed for any other purpose than this Settlement.  This does not apply to publically-available information or documents.

10.3    The Parties agree to return or dispose of confidential documents and information exchanged in negotiating this Settlement Agreement within Fifteen days of the Effective Date. This does not apply to publically-available information or documents.

10.4    The Parties agree that the terms of the Class Settlement Agreement were negotiated at arm's length and in good faith by the Parties and reflect a settlement that was reached voluntarily after consultation with experienced legal counsel.

10.5    The Parties and their respective counsel agree to use their best efforts and to cooperate fully with one another (i) in seeking preliminary and final Court approval of this settlement; and (ii) in effectuating the full consummation of the settlement provided for herein.

10.6    Each counsel or other person executing this Class Settlement Agreement on behalf of any Party hereto warrants that such person has the authority to do so.

10.7    This Class Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  Executed counterparts shall be deemed valid if delivered by mail, courier, electronically, or by facsimile.

10.8    This Class Settlement Agreement shall be binding upon and inure to the benefit of the settling Parties (including all Settlement Class Members), their respective agents, attorneys, insurers, employees, representatives, officers, directors, partners, divisions, subsidiaries, affiliates, associates, assigns, heirs, successors in interest, and shareholders, and any trustee or other officer appointed in the event of a bankruptcy, as well as to all Released Persons as defined in Section 2.25.  The waiver by any Party of a breach of this Class Settlement Agreement by any other Party shall not be deemed a waiver of any other breach of this Class Settlement Agreement.

10.9    This Class Settlement Agreement and any exhibits attached to it constitute the entire agreement between the Parties hereto and supersede any prior agreements or understandings, whether oral, written, express, or implied between the Parties with respect to the settlement.

10.10   No amendment, change, or modification of this Class Settlement Agreement or any part thereof shall be valid unless in writing, signed by all Parties and their counsel, and approved by the Court.

10.11   The Parties to this Class Settlement Agreement each represent to the other that they have received independent legal advice from attorneys of their own choosing with respect to the advisability of making the settlement provided for in this Class Settlement Agreement, and with respect to the advisability of executing this Class Settlement Agreement, that they have read this Class Settlement Agreement in its entirety and fully understand its contents, and that each is executing this Class Settlement Agreement as a free and voluntary act.

10.12   Except as otherwise provided herein, all notices, requests, demands, and other communications required or permitted to be given pursuant to this Class Settlement Agreement

shall be in writing and shall be delivered personally, by facsimile, by e-mail, or by overnight mail, to the undersigned counsel for the Parties at their respective addresses.

      10.13   The titles and captions contained in this Class Settlement Agreement are inserted only as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Class Settlement Agreement or the intent of any of its provisions.  This Class Settlement Agreement shall be construed without regard to its drafter, and shall be construed as though the Parties participated equally in the drafting of this Class Settlement Agreement.

      10.14   The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Class Settlement Agreement and the Parties to the Class Settlement Agreement submit to the jurisdiction of the Court for those purposes.

      10.15   To the extent Class Counsel wish to issue any general or public communication about the settlement, any such public statement shall be limited to publically available information and documents filed in this action and/or in a form mutually agreed upon by Class Counsel and SVG's Counsel.

      **IN WITNESS WHEREOF**, Seventh Generation, Inc., and Maggie Tsan, Erica Wildstein, and Tziva Rapoport-Hecht on behalf of themselves and all others similarly situated, intending to be legally bound hereby, have duly executed this Class Settlement Agreement as of the date set forth below, along with their counsel.

Dated:_____    By:_____
                                      Plaintiff Maggie Tsan


Dated:_____    By:_____
                                      Plaintiff Erica Wildstein

shall be in writing and shall be delivered personally, by facsimile, by e-mail, or by overnight mail, to the undersigned counsel for the Parties at their respective addresses.

10.13   The titles and captions contained in this Class Settlement Agreement are inserted only as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Class Settlement Agreement or the intent of any of its provisions.  This Class Settlement Agreement shall be construed without regard to its drafter, and shall be construed as though the Parties participated equally in the drafting of this Class Settlement Agreement.

10.14   The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Class Settlement Agreement and the Parties to the Class Settlement Agreement submit to the jurisdiction of the Court for those purposes.

10.15   To the extent Class Counsel wish to issue any general or public communication about the settlement, any such public statement shall be limited to publically available information and documents filed in this action and/or in a form mutually agreed upon by Class Counsel and SVG's Counsel.

**IN WITNESS WHEREOF**, Seventh Generation, Inc., and Maggie Tsan, Erica Wildstein, and Tziva Rapoport-Hecht on behalf of themselves and all others similarly situated, intending to be legally bound hereby, have duly executed this Class Settlement Agreement as of the date set forth below, along with their counsel.

Dated: _6/22/16_            By: _____
                                  Plaintiff Maggie Tsan

Dated: _____     By: _____
                                  Plaintiff Erica Wildstein

42

shall be in writing and shall be delivered personally, by facsimile, by e-mail, or by overnight mail, to the undersigned counsel for the Parties at their respective addresses.

    10.13  The titles and captions contained in this Class Settlement Agreement are inserted only as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Class Settlement Agreement or the intent of any of its provisions. This Class Settlement Agreement shall be construed without regard to its drafter, and shall be construed as though the Parties participated equally in the drafting of this Class Settlement Agreement.

    10.14  The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Class Settlement Agreement and the Parties to the Class Settlement Agreement submit to the jurisdiction of the Court for those purposes.

    10.15  To the extent Class Counsel wish to issue any general or public communication about the settlement, any such public statement shall be limited to publically available information and documents filed in this action and/or in a form mutually agreed upon by Class Counsel and SVG's Counsel.

    **IN WITNESS WHEREOF**, Seventh Generation, Inc., and Maggie Tsan, Erica Wildstein, and Tziva Rapoport-Hecht on behalf of themselves and all others similarly situated, intending to be legally bound hereby, have duly executed this Class Settlement Agreement as of the date set forth below, along with their counsel.

Dated:_____

By:_____
Plaintiff Maggie Tsan

Dated:__6/28/16__

By:_____
Plaintiff Erica Wildstein

Dated: _6/29/16_        By: _____
                                       Plaintiff Tziva Rapoport-Hecht

                                       Seventh Generation, Inc.

Dated: _____    By: _____


                                       REESE LLP


Dated: _____    By: _____
                                       Michael R. Reese, Esq.
                                       Reese LLP
                                       Attorneys for Plaintiff Maggie Tsan and
                                       Erica Wildstein

                                       TYCKO & ZAVAREEI LLP


Dated: _____    By: _____
                                       Jeffrey D. Kaliel, Esq.
                                       Tycko & Zavareei LLP
                                       Attorneys for Plaintiffs

Dated:_____

By:_____
Plaintiff Tziva Rapoport-Hecht


Seventh Generation, Inc.

Dated:   June 27, 2016

By:_____
John Replogle
Its Chief Executive Officer


REESE LLP


Dated:_____

By:_____
Michael R. Reese, Esq.
Reese LLP
Attorneys for Plaintiff Maggie Tsan and
Erica Wildstein


TYCKO & ZAVAREEI LLP


Dated:_____

By:_____
Jeffrey D. Kaliel, Esq.
Tycko & Zavareei LLP
Attorneys for Plaintiffs


43

Dated:_____     By:_____
                                   Plaintiff Tziva Rapoport-Hecht


                                   Seventh Generation, Inc.


Dated:_____     By:_____
                                   John Replogle
                                   Its Chief Executive Officer


                                   REESE LLP


              June 28, 2016
Dated:_____     By:_____
                                   Michael R. Reese, Esq.
                                   Reese LLP
                                   Attorneys for Plaintiff Maggie Tsan and
                                   Erica Wildstein


                                   TYCKO & ZAVAREEI LLP


Dated:_____     By:_____
                                   Jeffrey D. Kaliel, Esq.
                                   Tycko & Zavareei LLP
                                   Attorneys for Plaintiffs

Dated:_____         By:_____
                                      Plaintiff Tziva Rapoport-Hecht


                                      Seventh Generation, Inc.


Dated:_____         By:_____



                                      REESE LLP


Dated:_____         By:_____
                                      Michael R. Reese, Esq.
                                      Reese LLP
                                      Attorneys for Plaintiff Maggie Tsan and
                                      Erica Wildstein

                                      TYCKO & ZAVAREEI LLP

          June 27, 2016
Dated:_____         By:_____
                                      Jeffrey D. Kaliel, Esq.
                                      Tycko & Zavareei LLP
                                      Attorneys for Plaintiffs

43

HALUNEN LAW

Dated:_____06/30/16_____        By:_____
                                  Melissa Wolchansky, Esq.
                                  Halunen Law
                                  Attorneys for Plaintiffs

                                  THE SULTZER LAW GROUP

Dated:_____        By:_____
                                  Jason P. Sultzer, Esq.
                                  Joseph Lipari, Esq.
                                  The Sultzer Law Group
                                  Attorneys for Plaintiff Tziva Rapoport-Hecht

                                  MINTZ LEVIN COHN FERRIS
                                  GLOVSKY and POPEO, P.C.

Dated:_____        By:_____
                                  Daniel J. Herling, Esq.
                                  Mintz Levin Cohn Ferris Glovsky and
                                  Popeo, P.C.
                                  Attorneys for Defendant Seventh
                                  Generation, Inc.

HALUNEN LAW

Dated:_____

By:_____
Melissa Wolchansky, Esq.
Halunen Law
Attorneys for Plaintiffs

THE SULTZER LAW GROUP

Dated:_____6/29/16_____

By:_____
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
The Sultzer Law Group
Attorneys for Plaintiff Tziva Rapoport-Hecht

MINTZ LEVIN COHN FERRIS
GLOVSKY and POPEO, P.C.

Dated:_____

By:_____
Daniel J. Herling, Esq.
Mintz Levin Cohn Ferris Glovsky and
Popeo, P.C.
Attorneys for Defendant Seventh
Generation, Inc.

44

HALUNEN LAW

Dated:_____     By:_____
                                  Melissa Wolchansky, Esq.
                                  Halunen Law
                                  Attorneys for Plaintiffs

                                  THE SULTZER LAW GROUP

Dated:_____     By:_____
                                  Jason P. Sultzer, Esq.
                                  Joseph Lipari, Esq.
                                  The Sultzer Law Group
                                  Attorneys for Plaintiff Tziva Rapoport-Hecht

                                  MINTZ LEVIN COHN FERRIS
                                  GLOVSKY and POPEO, P.C.

Dated:_ June 30, 2016 _____     By:_____
                                  Daniel J. Herling, Esq.
                                  Mintz Levin Cohn Ferris Glovsky and
                                  Popeo, P.C.
                                  Attorneys for Defendant Seventh
                                  Generation, Inc.

# EXHIBIT A

# Rapoport-Hecht et al. v. Seventh Generation Inc.
# Claim Form Instructions

### INSTRUCTIONS FOR COMPLETING THE CLAIM FORM

If you believe you are an eligible Settlement Class Member and you wish to apply for a Settlement benefit, you must complete and submit a Claim Form. Please read the full Notice of Class Action Settlement available at **www.SVGClassAction.com** carefully before completing a Claim Form. You may submit your Claim Form online at the Settlement website or by completing the enclosed Claim Form and mailing it to the Settlement Administrator:

**WEB:**     **Visit the Settlement website at www.SVGClassAction.com and submit your claim online.**

**MAIL**:     SVG Class Action
         Claims Administrator
         1801 Market Street, Suite 660
         Philadelphia, PA 19103

If you submit your Claim Form online, you must do so on or before _____, 2016.  If you are mailing your Claim Form, first-class United States Mail, it must be post-marked no later than _____, 2016.

### SECTION B – PURCHASES WITH PROOF OF PURCHASE DOCUMENTATION
Include in Section B of this Claim Form purchases of Seventh Generation, Inc. ("SVG") Products you made during the Class Period for which you are attaching documentation demonstrating Proof of Purchase to establish the amount you paid for each product.  For a complete list of eligible SVG Products, refer to Section C.  Proof of Purchase means a receipt or other documentation reasonably establishing the fact and date of purchase, and the price paid for an SVG Product during the Settlement Class Period in the United States.

### SECTION C – PURCHASES WITHOUT PROOF OF PURCHASE DOCUMENTATION
Include in Section C of this Claim Form purchases of SVG Products you made during the Class Period for which you are unable to provide documentation demonstrating Proof of Purchase.

You may claim both purchases with Proof of Purchase documentation Section B AND purchases for which you do not have documentation in Section C.  However, do not include the same purchase in both Sections.

For example, if you purchased an eligible SVG Product 5 times during the Class Period and you have receipts for 2 of those purchases, include the 2 purchases with documentation in Section B and list the other 3 purchases without documentation in Section C.

If you have questions about this Claim Form, please visit the website at **www.SVGClassAction.com**, or contact the Claims Administrator via email: [insert email address] or toll-free at [phone number].

### CLAIM FORM REMINDER CHECKLIST

**Before submitting this Claim Form, please make sure you:**

1.   Complete all fields in Section A (Name and Contact Information) of this Claim Form.

2.   Complete Sections B and C to report the SVG Products you purchased.

3.   YOU MUST sign the Attestation under penalty of perjury in Section C of this Claim Form.

**Please keep a copy of your Claim Form for your records.**

<table>
<tr><td>

**Your claim must be postmarked by: xxxx xx, 2016**

</td><td>

**Rapoport-Hecht et al. v. Seventh Generation Inc.**
**Claim Form**

</td><td>

**SVG**

**Claim Form**

</td></tr>
</table>

## SECTION A:   NAME AND CONTACT INFORMATION

Provide your name and contact information below. It is your responsibility to notify the Claims Administrator of any changes to your contact information after the submission of your Claim Form.

**First Name**

**Last Name**

**Street Address**

**City**

**State**

**Zip Code**

**Phone Number**

**E-Mail Address**

## SECTION B:   SVG PURCHASES WITH PROOF OF PURCHASE DOCUMENTATION

**If you do not have Proof of Purchase documentation to submit with your claim, skip this section and proceed to SECTION C.**

**Provide the following information regarding Purchases of SVG Products you made during the Class Period for which you are attaching documentation. Proof of Purchase documentation must include the name of the SVG Product(s), name of store where purchase(s) was/were made, the date purchased, and the amount paid.  For your reference, a complete list of eligible SVG Products is located in Section C.**

**Total Number of Products Purchased during the Class Period for which I am attaching documentation:**

**Total Number of Proof of Purchase Documents Attached to this Claim Form:**

**Total Amount Paid for Documented Purchases: $**

**NOTE: If you made any additional purchases during the Class Period for which you are unable to provide Proof of Purchase documentation, please proceed to SECTION C on the following page.  Otherwise, proceed to Section D to sign your claim.**

**OVER**

---

**SECTION D:   ATTESTATION UNDER PENALTY OF PERJURY**

---

I declare, under penalty of perjury, that the information in this Claim Form is true and correct to the best of my knowledge, and that I resided in the United States and purchased in the United States, the SVG Product(s) claimed above during the Class Period for personal or household consumption and not for resale.  I understand that my Claim Form may be subject to audit, verification, and Court review.

| | |
|---|---|
| Signature | Date |

Print Name

**Please note that you will not be eligible to receive any settlement benefits unless you sign above.**

# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# If you purchased certain Seventh Generation, Inc. ("SVG") Products Between November 14, 2010 and [date of preliminary approval order] You May be Eligible to Receive a Payment from a Class Action Settlement.

*A Federal Court authorized this notice.  This is not a solicitation from a lawyer.*

- A proposed nationwide Settlement has been reached in a class action lawsuit involving certain SVG Products. The Settlement resolves litigation over whether SVG allegedly violated state and federal laws regarding the labeling, marketing and advertising of certain SVG Products. A description of the SVG Products at issue, and where to find a full list of them, is discussed below in Part 6.

- You may be eligible to participate in the proposed Settlement, if it is finally approved, if you purchased certain SVG Products between November 14, 2010 and [date of preliminary approval order].

- The Settlement will provide payments to those who qualify.  You will need to file a Claim Form to get a payment from the Settlement.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

## YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT

| | |
|---|---|
| **SUBMIT A CLAIM FORM BY [MONTH XX, 2016]** | This is the only way to get a payment. |
| **EXCLUDE YOURSELF BY [MONTH XX, 2016]** | Get no payment from the Settlement.  This is the only option that allows you to ever be a part of any other lawsuit against SVG about the legal claims in this case. |
| **OBJECT BY [MONTH XX, 2016]** | Write to the Court about why you think the settlement is unfair, inadequate or unreasonable. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Get no payment.  Give up rights to ever sue SVG about the legal claims in this case. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.  The deadlines may be moved, canceled, or otherwise modified, so please check the Settlement Website at www.SVGClassAction.com regularly for updates and further details.

- The Court in charge of this case still has to decide whether to approve the Settlement.  Payments will be made if the Court approves the Settlement and after any appeals are resolved.  Please be patient.

## Wʜᴀᴛ Tʜɪs Nᴏᴛɪᴄᴇ Cᴏɴᴛᴀɪɴs:

**BASIC INFORMATION**
1. Why is there a notice?
2. What is this lawsuit about?
3. Why is this a class action?
4. Why is there a Settlement?

**WHO IS IN THE SETTLEMENT?**
5. How do I know if I am in the Settlement?
6. Which Products are included in the Settlement?
7. What if I am still not sure if I am included in the Settlement?

**SETTLEMENT BENEFITS**
8. What does the Settlement provide?
9. What can I get from the Settlement?
10. What am I giving up to stay in the Class?

**HOW TO GET A PAYMENT**
11. How can I get a payment?
12. When will I get my payment?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**
13. How do I get out of the Settlement?
14. If I don't exclude myself, can I sue the Defendant for the same thing later?
15. If I exclude myself, can I still get a payment?

**OBJECTING TO THE SETTLEMENT**
16. How can I tell the Court if I do not like the Settlement?
17. What is the difference between objecting and excluding?

**THE LAWYERS REPRESENTING YOU**
18. Do I have a lawyer in this case?
19. How will the lawyers be paid?

**THE COURT'S FAIRNESS HEARING**
20. When and where will the Court decide whether to approve the Settlement?
21. Do I have to come to the hearing?
22. May I speak at the hearing?

**IF YOU DO NOTHING**
23. What happens if I do nothing at all?

**GETTING MORE INFORMATION**
24. How do I get more information?

## BASIC INFORMATION

**1.    Why is there a notice?**

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Southern District of New York (the "Court"), and the case is called *Tziva Rapoport-Hecht et al. v. Seventh Generation, Inc.*, Case No. 7:14-cv-09087-KMK (S.D.N.Y.).  The individuals who sued are called the Plaintiffs, and the company they sued, Seventh Generation, Inc. ("SVG"), is called the Defendant.

**2.    What is this lawsuit about?**

The lawsuit alleges that the Defendant violated certain laws in labeling, marketing, and advertising of certain SVG Products.

The Defendant denies any and all wrongdoing of any kind whatsoever, and denies any liability to Plaintiffs and to the Settlement Class.

**3.    Why is this a class action?**

In a class action, one or more people, called "Class Representatives," sue on behalf of people who have similar claims.  All these people are in a "class" and are "class members," except for those who exclude themselves from the class.  U.S. District Court Judge Karas in the United States District Court for the Southern District of New York is in charge of this class action.

**4.    Why is there a Settlement?**

The Defendant is not admitting that it did anything wrong and both sides want to avoid the cost of further litigation.  The Court has not decided in favor of the Plaintiffs or the Defendant.  The Class Representatives and their attorneys think the Settlement is best for everyone who is affected.  The Settlement provides the opportunity for Class Members to receive Settlement benefits.

## WHO IS IN THE SETTLEMENT?

**5.    How do I know if I am in the Settlement?**

The Class includes all persons and entities who both resided in the United States and purchased in the United States any of the SVG Products for their household use or personal consumption and not for resale from November 14, 2010 to [date of preliminary approval order]. Excluded from the Settlement Class are: (a) SVG's board members or executive-level officers, including its attorneys; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Settlement Class in accordance with the procedures approved by the Court.

**6.    Which Products are included in the Settlement?**

The eligible SVG Products in the Settlement include certain Baby Care Products, Personal Care Products, Dishwashing Products, Laundry Products and Household Products. For a full list of eligible SVG Products in the Settlement, please visit the Settlement website: www.SVGClassAction.com.

**7.    What if I am still not sure if I am included in the Settlement?**

If you are not sure whether you are a Class Member, or have any other questions about the Settlement Agreement, you should visit the Settlement website, www.SVGClassAction.com, or call the toll-free number, [insert toll-free number].

## SETTLEMENT BENEFITS

**8.** **What does the Settlement provide?**

The Settlement provides for the establishment of a Settlement Fund with a value of $4,500,000.00 to pay (1) Claims of eligible Class Members; (2) the costs of notice and administration; (3) Attorneys' Fees and Expenses awarded by the Court; (4) any Incentive Award made by the Court to Plaintiffs; and (5) any necessary taxes and tax expenses. Class Members who timely submit valid Claim Forms are entitled to receive a cash payment from the Settlement fund.  The actual amount recovered by each Settlement Class Member will not be determined until after the Claim Period has ended and all Claims have been calculated.

**9.** **What can I get from the Settlement?**

If you submit a valid Claim Form by the deadline, you can get a payment from the Settlement Fund.  If, after subtracting from the Settlement Fund the payments for the Class Representatives, Attorneys' Fees and Expenses, administration expenses, and necessary taxes and tax expenses, the funds remaining in the Settlement Fund are insufficient to pay all of the Approved Claims, then Class Member payments will be reduced proportionately.

**10.** **What am I giving up to stay in the Class?**

Unless you exclude yourself from the Settlement, you cannot sue the Defendant, continue to sue, or be part of any other lawsuit against the Defendant about the legal issues in this case.  It also means that all of the decisions by the Court will bind you.  The Release is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you stay in the Class.   The Settlement Agreement is available at www.SVGClassAction.com.

# HOW TO GET A PAYMENT

**11.** **How can I get a payment?**

To be eligible to receive a payment from the Settlement, you must complete and submit a timely Claim Form. You can complete and submit your Claim Form online at the Settlement website: www.SVGClassAction.com. The Claim Form can be downloaded from the Settlement website, as well.  You can request a Claim Form sent to you by sending a written request to the Settlement Administrator by mail, email or by calling toll-free.

**MAIL**:   SVG Class Action
Claims Administrator
1801 Market Street, Suite 660
Philadelphia, PA 19103

**EMAIL**:  [insert email address]

**PHONE**:  [insert toll-free number]

Please read the instructions carefully, fill out the Claim Form, and mail it postmarked no later than [**Month XX, 2016**] to: *SVG Class Action,* Claims Administrator, 1801 Market Street, Suite 660, Philadelphia, PA 19103, or submit your Claim Form online at www.SVGClassAction.com by [Month XX, 2016].

If, after subtracting from the Settlement Fund the payments for the Class Representatives, attorneys' fees and costs, administration expenses, and necessary taxes and tax expenses, the funds remaining in the Settlement Fund are insufficient to pay all of the Approved Claims, then Class Member payments will be reduced proportionately.

If you do not submit a valid Claim Form by the deadline, you will not receive a payment.

**12.** **When will I get my payment?**

Payments will be mailed to Class Members who send in valid and timely Claim Forms after the Court grants "final approval" to the Settlement and after any and all appeals are resolved.  If the Court approves the Settlement after a hearing on [Month XX, 2016], there may be appeals.  It's always uncertain whether these appeals can be resolved, and resolving them can take time.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement Fund, and you want to keep the right to sue or continue to sue the Defendant on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself—or it is sometimes referred to as "opting out" of the Class.

### 13.   How do I get out of the Settlement?

To exclude yourself (or "Opt-Out") from the Settlement, you must complete and mail to the Claims Administrator a written request that includes the following:

- Your name and address;

- The name of the case (*Tziva Rapoport-Hecht et al. v. Seventh Generation, Inc.*, Case No. 7:14-cv-09087-KMK (S.D.N.Y.));

- A statement that you want to be excluded from this Settlement; and

- Your signature.

You must mail your exclusion request, postmarked no later than [Month XX, 2016] to:

<div align="center">

*SVG Class Action*
Claims Administrator
1801 Market Street, Suite 660
Philadelphia, PA 19103

</div>

If you don't include the required information or submit your Request for Exclusion on time, you will remain a Class Member and will not be able to sue the Defendant about the claims in this lawsuit.

### 14.   If I don't exclude myself, can I sue the Defendant for the same thing later?

No. Unless you exclude yourself, you give up any right to sue the Defendant for the claims that this Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

### 15.   If I exclude myself, can I still get a payment?

No. You will not get any money from the Settlement if you exclude yourself. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

## OBJECTING TO THE SETTLEMENT

### 16.   How can I tell the Court if I do not like the Settlement?

If you are a Class Member, you can object to the Settlement or to Class Counsel's request for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, telephone number, and, if available, email address;

- The name, address, email address, and telephone number of your lawyer, if you have one, including any former or current counsel who may be entitled to compensation for any reason related to the objection;

- The name of the case (*Tziva Rapoport-Hecht et al. v. Seventh Generation, Inc.*, Case No. 7:14-cv-09087-KMK (S.D.N.Y.));

- The reasons you object to the Settlement, accompanied by any legal support for your objection;

- A statement of whether you intend to appear at the Fairness Hearing, either with or without counsel;

- A statement of your membership in the Class, including all information required by the Claim Form;

- A detailed list of any other objections submitted by you or your counsel, to any class actions submitted in any court, whether state or otherwise, in the United States in the previous five (5) years, or a statement that you have not objected to any class action settlement in any court in the United States in the previous five (5) years; and

- Your signature and, if you have one, your lawyer's signature.

Your objection, along with any supporting material you wish to submit, must be filed with the Court, with a copy delivered to Class Counsel and Defendant's Counsel no later than thirty (30) days before the Fairness Hearing, [Month XX, 2016], at the following addresses:

| Court | Class Counsel | Class Counsel |
|---|---|---|
| The United States District Court for the Southern District of New York<br>The Hon. Charles L. Brieant Jr. Federal Building and United States Courthouse<br>300 Quarropas Street<br>White Plains, NY 10601-4150 | Michael R. Reese<br>Reese LLP<br>100 West 93rd Street, 16th Floor<br>New York, NY 10025 | Melissa W. Wolchansky<br>Halunen Law<br>80 South Eighth Street<br>Minneapolis, MN 55402 |
| **Class Counsel** | **Class Counsel** | **Defense Counsel** |
| Jeffrey D. Kaliel<br>Tycko & Zavareei LLP<br>1828 L Street, NW, Suite 1000<br>Washington D.C. 20036 | Joseph Lipari<br>The Sultzer Law Group<br>85 Civic Center Plaza, Suite 104<br>Poughkeepsie, NY 12601 | Daniel J. Herling<br>Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104 |

**17.   What is the difference between objecting and excluding?**

Objecting is simply telling the Court that you don't like something about the Settlement.  You can object to the Settlement only if you do not exclude yourself from the Settlement.  Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement.  If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

# THE LAWYERS REPRESENTING YOU

**18.   Do I have a lawyer in this case?**

Yes.  The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent all Class Members: Michael R. Reese of Reese LLP; Melissa W. Wolchansky of Halunen Law; Jeffrey D. Kaliel of Tycko & Zavareei LLP and Joseph Lipari of The Sultzer Law Group.

You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**19.   How will the lawyers be paid?**

Class Counsel intends to file a motion on or about [Month XX, 2016] seeking $1,500,000.00 in Attorneys' Fees and Expenses.  The fees and expenses awarded by the Court will be paid from the Settlement Fund.  The Court will determine the amount of fees and expenses to award. Class Counsel will also request that $5,000.00 be paid from the Settlement Fund to each of the named Plaintiffs who helped the lawyers on behalf of the whole Class.

# THE COURT'S FAIRNESS HEARING

**20.   When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing on **[Month XX, 2016]** at [insert time] at the United States District Court for the Southern District of New York, before the Honorable Kenneth M. Karas, U.S. District Judge, in Courtroom 521, The Hon. Charles L. Brieant Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, NY 10601-4150.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.SVGClassAction.com for updates.  At the Fairness Hearing, the Court will consider whether the Settlement

Agreement is fair, reasonable, and adequate.  The Court will also consider the fees to award to Class Counsel and the incentive awards for the Class Representatives.  If there are objections, the Court will consider them at this time.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long these decisions will take.

**21.**   **Do I have to come to the hearing?**

No.  Class Counsel will answer any questions that the Court may have, but you may come at your own expense.  If you send an objection, you don't have to come to Court to talk about it.  As long as you mailed your written objection on time to the proper addresses, the Court will consider it.  You may also pay your own lawyer to attend, but it's not necessary.

**22.**   **May I speak at the hearing?**

Yes.  You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that it is your "Notice of Intention to Appear."  In your letter, you must include the following:

- Your name, address, telephone number, and, if available, email address;
- The name, address, email address, and telephone number of any lawyer(s) who will be appearing on your behalf at the Fairness Hearing;
- The name of the case (*Tziva Rapoport-Hecht et al. v. Seventh Generation, Inc.*, Case No. 7:14-cv-09087-KMK (S.D.N.Y.)); and
- Your signature and, if you have one, your lawyer's signature.

Your Notice of Intent to Appear must be filed with the Court no later than fifteen (15) days before the Fairness Hearing, [insert date].

## IF YOU DO NOTHING

**23.**   **What happens if I do nothing at all?**

If you do nothing, you will not get a payment from the Settlement.  Unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendant about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

**24.**   **How do I get more information?**

This notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can review a complete copy of Settlement Agreement and other information at www.SVGClassAction.com.  If you have additional questions or want to request a Claim Form, you can visit the Settlement Website: www.SVGClassAction.com. You can also write to the Claims Administrator by mail or email, or call toll-free.

**MAIL**:   SVG Class Action
Claims Administrator
1801 Market Street, Suite 660
Philadelphia, PA 19103

**EMAIL**: [insert email address]

**PHONE**: [insert toll-free number]

Updates will be posted at www.SVGClassAction.com as information about the Settlement process becomes available.

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE CONCERNING THIS CASE.**

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TZIVA RAPOPORT-HECHT, MAGGIE TSAN and ERICA WILDSTEIN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SEVENTH GENERATION, INC.,<br><br>Defendant. | Civil Action No. 7:14-cv-09087-KMK |

**DECLARATION OF STEVEN WEISBROT, ESQ. ON ADEQUACY OF NOTICE PLAN**

STEVEN WEISBROT, ESQ., of full age, hereby declares under penalty of perjury as follows:

1.     I am Executive Vice President of Notice & Strategy at the class action notice and Settlement Administration firm, Angeion Group, LLC ("Angeion").  I am fully familiar with the facts contained herein based upon my personal knowledge.

2.     I have been responsible in whole or in part for the design and implementation of more than one hundred class action administration plans and have taught numerous Accredited Continuing Legal Education courses on the Ethics of Legal Notification in Class Action Settlements, using Digital Media in Class Action Notice Programs, as well as Class Action Claims Administration, generally. Additionally, I am the author of frequent articles on Class Action Notice, Digital Media, Class Action Claims Administration and Notice Design in publications such as *Bloomberg, BNA Class Action Litigation Report*, Law360, the ABA Class Action and Derivative Section Newsletter and private law firm publications.

3.      Prior to joining Angeion's executive team, I was employed as Director of Class Action services at Kurtzman Carson Consultants ("KCC"), a nationally recognized class action notice and settlement administrator. Prior to my notice and claims administration experience, I was employed in private law practice and I am currently an attorney in good standing in the State of New Jersey and the Commonwealth of Pennsylvania.

4.      My work comprises a wide range of class actions that includes product defect, false advertising, employment, antitrust, tobacco, banking, insurance, and bankruptcy cases.  Likewise, I have been instrumental in infusing digital and social media, as well as big data and advanced targeting into class action notice programs. For example, the Honorable Sarah Vance stated in her December 31, 2014 Order in *In Re: Pool Products Distribution Market Antitrust Litigation MDL No. 2328*:

> To make up for the lack of individual notice to the remainder of the class, the parties propose a print and web-based plan for publicizing notice. The Court welcomes the inclusion of web-based forms of communication in the plan….The Court finds that the proposed method of notice satisfies the requirements of Rule 23(c)(2)(B) and due process.
>
> The direct emailing of notice to those potential class members for whom Hayward and Zodiac have a valid email address, along with publication of notice in print and on the web, is reasonably calculated to apprise class members of the settlement. Moreover, the plan to combine notice for the Zodiac and Hayward settlements should streamline the process and avoid confusion that might otherwise be caused by a proliferation of notices for different settlements. Therefore, the Court approves the proposed notice forms and the plan of notice.

*In re: Pool Prods. Distrib. Market Antitrust Litig.*, MDL No. 2328 (E.D. La. Dec. 31, 2014) (ECF No. 551, at 43-44).

5.      As detailed below, courts have repeatedly recognized my work in the design of class action notice programs:

(a)     For example, on May 11, 2016 in his Order granting preliminary approval of the settlement in *In Re Whirlpool Corp. Front Loading Washer Products Liability Litigation* (MDL No. 2001), the Honorable Christopher A. Boyko stated:

> The Court, having reviewed the proposed Summary Notices, the proposed FAQ, the proposed Publication Notice, the proposed Claim Form, and the proposed plan for distributing and disseminating each of them, finds and concludes that the proposed plan for distributing and disseminating each of them will provide the best notice practicable under the circumstances and satisfies all requirements of federal and state laws and due process.

*In re: Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 1:08-wp-65000, MDL No. 2001 (N.D. Ohio May 11, 2016) (ECF NO. 551, at 10).

(b)   In *Sateriale, et al v R.J. Reynolds Tobacco Co.,* Case No. CV 09 08394 CAS (C.D. Cal.), the Honorable Christina A. Snyder stated:

> The Court finds that the Notice provided to the Settlement Class pursuant to the Settlement Agreement and the Preliminary Approval Order . . . has been successful, was the best notice practicable under the circumstances and (1) constituted notice that was reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the Action, their right to object to the Settlement, and their right to appear at the Final Approval Hearing; (2) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (3) met all applicable requirements of the Federal Rules of Civil Procedure, Due Process, and the rules of the Court.

*Sateriale, et al v R.J. Reynolds Tobacco Co.,* Case No. CV 09 08394 CAS (C.D. Cal. May 3, 2016) (ECF NO. 233, ¶ 5).

(c) In *Barron et al. v. Snyder's-Lance, Inc.*, Case No. 0:13-cv-62496 (S.D. Fla.), the Honorable Joan A. Lenard stated:

> The Court approves, as to form and content, the Long-Form Notice and Short-Form Publication Notice attached to the Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement as Exhibits 1 and 2 to the Stipulation of Settlement. The Court also approves the procedure for disseminating notice of the proposed settlement to the Settlement Class and the Claim Form, as set forth in the Notice and Media Plan attached to the Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement as Exhibits G. The Court finds that the notice to be given constitutes the best notice practicable under

3

the circumstances, and constitutes valid, due, and sufficient notice to the Settlement Class in full compliance with the requirements of applicable law, including the Due Process Clause of the United States Constitution.

*Barron v. Snyder's-Lance, Inc.*, Case No. 0:13-cv-62496 (S.D. Fla. Feb. 12, 2016) (ECF No. 202, ¶ 7).

6.     By way of background, Angeion Group is a class action notice and claims administration company formed by an experienced team of executives with more than 65 combined years of experience implementing claims administration and notice solutions for class action settlements and judgments. With executives that have had extensive tenures at five other nationally recognized claims administration companies, collectively, the management team at Angeion has overseen more than 2,000 class action settlements and distributed over $10 billion to class members.

7.     This declaration will describe the notice program that we suggest using in this matter, including the considerations that informed the development of the plan and why it will meet the expressed requirements of Rule 23 and provide Due Process of Law to the class members.

## SUMMARY OF NOTICE PROGRAM

8.      The notice program is the best notice that is practicable under the circumstances, combining state-of-the-art internet banner ad notice and traditional print publication notice. The notice program also includes an informational website and toll-free telephone line, both of which will further apprise potential settlement Class Members of their rights and options in the settlement.

9.     The media notice program was designed to deliver an approximate 70.03% reach with an average frequency of 3.0 times each. The media notice program will serve approximately 87,100,000 impressions, via the use of highly targeted internet banner ads and will also incorporate traditional publication notice in *Organic Life* magazine. Further, to satisfy the notice requirements

4

of the California Consumers Legal Remedies Act ("CLRA"), the notice program will incorporate four 1/4 page ads in the California regional edition of *USA Today*, to run on four consecutive weeks.  Additionally, the response mechanisms described in greater detail below, were not used in calculating the reported reach percentage and frequency. According to the *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* ("The Checklist"): *"The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%."*  The checklist further cautions Judges to confirm that the reach calculations are based on accepted methodology.

## CLASS DEFINITION

10.     The "Settlement Class" includes all persons and entities who, during the Class Period, both resided in the United States and purchased in the United States any of the Seventh Generation ("SVG") Products for their household use or personal consumption and not for resale. Excluded from the Settlement Class are: (a) SVG's board members or executive-level officers, including its attorneys; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Settlement Class in accordance with the procedures approved by the Court.

## MEDIA NOTICE TARGET AUDIENCE

11.     In order to develop the media plan for the notice program, the Class was profiled using GfK MRI 2015 Doublebase data[1]. GFK MRI data is used by advertising agencies and other

---

[1]     GfK MRI is a leading supplier of publication readership and product usage data for the communications industry. GfK MRI offers complete demographic, lifestyle, product usage and exposure to all forms of advertising media. As the leading U.S. source of multimedia audience research, GfK MRI provides information to magazines, television and radio networks and stations, internet sites, other media, leading national advertisers, and over 450 (cont.)

communications professionals in order to understand the socio-economic characteristics, interests and practices of a target group and aids in the proper selection of media to reach that target. It is also instrumental in allowing the court to review the estimated net reach and average frequency of a particular program and is precisely the type of accepted methodology that the Checklist cautions should be used in class action notice programs. As "Seventh Generation" is not measured specifically in this syndicated data source, a broad, MRI was used to profile an over inclusive target group definition, which allows Angeion to target an audience most similar to the class definition.   The following target definition was used to ensure that the notice program reaches a consumer group most likely to include potential Class Members:

- Liquid Soaps/Hand Sanitizers Brands Total Users Last 6 Months [Other] or;
- Dishwashing Liquid Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Household Cleaners Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Soap & Detergents for Regular Laundry Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Laundry Pre-Treatments & Stain Removers Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Fabric Softeners Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Pre-Moistened Baby/Children's Wipes Total Brands Last 6 Months (Principal Shopper) [Other] or;
- Disposable Diapers/Underpants Total Brands Last 6 Months (Principal Shopper) [Other] and;
- I buy natural products because I am concerned about me and my family's health [Any Agree]

In essence, this over-inclusive definition will allow us to serve notice to consumers who purchase product categories contained in the class definition, who have an affinity towards natural products—not just consumers who purchase SVG Products, specifically. Additionally, using this over inclusive target audience based on GFK MRI data, will allow the court to find that the reach calculations are based on

---

advertising agencies – including 90 of the top 100 in the U.S. MRI's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the U.S.

accepted methodology and satisfy Due Process. Moreover, as outlined below, we will use third party purchase data for SVG Products, to target known users of SVG specifically, thereby combining and over-inclusive definition, with advanced targeting of known users, to offer the best notice practicable under the circumstance.

12.     Understanding the socio-economic characteristics, interests and practices of a target group further aids in the proper selection of media to reach that target. Here, the target audience has the following characteristics:

- Audience is 60% female and 40% male
- Between the ages of 25-54 with a median age of 46
- Majority are married (57.2%)
- 43% have a child/children under the age of 17 living in the household
- Higher educated with 44.4% having a college degree
- 45% live in households with total income above $75K
- 59.8% are employed, with most working full time (47%)

13.     In order to identify the best vehicles to deliver messaging to the target audience, we also reviewed the media quintiles, which measure the degree to which an audience uses media relative to the general population. Here, the data indicates that our target audience spends an average of 15 hours per week on the internet and reads about 7 magazine issues a month. The data also indicated that this audience watched less TV, listened to less radio and read fewer newspapers than the national average.

14.     In light of this data, we recommended using a combination of print and digital tactics to reach our audience, which will be the most cost effective means to generate the reach required to notify potential Class Members of their rights and options in this litigation.

## PUBLICATION NOTICE

15.     In order to identify the best print vehicle for delivery of notice messaging to the Target audience, SRDS was used to analyze and filter publications to determine the most editorial

7

relevant titles. *Organic Life* was chosen as the most relevant title for this notice program. The publication covers various topics regarding "Organic Living" including personal care, well-being, and home & garden.  It ultimately provides relevant editorial content while matching our target audience profile.

16.     Based on the print analysis, the notice program will utilize a 1/2 page advertisement featuring the Notice of the Settlement in *Organic Life* magazine.

17.     In order to satisfy the notice requirements of the CLRA, the notice program will utilize four 1/4 page ads in the California regional edition of *USA Today*. These ads will feature Notice of the Settlement and will run for four consecutive weeks.

## INTERNET BANNER NOTICE

18.     The notice program also utilizes a programmatic approach to purchasing internet media advertisements, which will enable the Notice Plan to target potential Class Members with tailored communications. Purchasing display and mobile inventory programmatically provides the highest reach for internet publication, allows for multiple targeting layers, and causes banner advertisements to be systematically shown to persons most likely to be Class Members.

19.     The internet campaign will implement multiple targeting layers to ensure that notice is delivered to the persons most likely to be members of the class, inclusive of search targeting, demographic targeting, category contextual targeting, keyword contextual targeting, site retargeting, and purchase data targeting. This enables Angeion to utilize, for example, search terms that an individual has entered into web browsers (like Google), to deliver banner ads to individuals most likely to be Class Members. Search terms, relevant to SVG's various products i.e. Baby Wipes, Cleaners, Detergents, and all-natural/organic products, will be incorporated into the campaign parameters to drive relevant traffic. Targeting users who are currently browsing or have recently browsed content in categories such as All-Natural and Organic Products will help qualify

8

impressions to ensure messaging is served to the most relevant audience. Importantly, a focus will be placed on SVG purchase data specifically. The purpose of such targeting is to ensure that likely Class Members are exposed to the notice documents while simultaneously minimizing the chance that notice is misdirected to individuals who are unlikely to be members of the class.

20.     The internet banner notice portion of the notice program will be implemented using a 4-week desktop and mobile campaign and utilizing standard IAB sizes (160x600, 300x250, 728x90, 300x600, 320x50 and 300x50). A 3x frequency cap will be imposed to maximize reach. The banner notice is designed to result in serving approximately 87,100,000 impressions.

## RESPONSE MECHANISMS

21.     The notice plan will implement the creation of a case website, where Class Members will have the ability to file a claim online, view general information about the Settlement, review relevant Court documents and view important dates and deadlines pertinent to the Settlement. The settlement website will also have a "Contact Us" page whereby Class Members can send an email with any additional questions to a dedicated email address.

22.     A toll-free hotline devoted to this case will be implemented to further apprise Class Members of the rights and options in the Settlement. The toll-free hotline will utilize an interactive voice response ("IVR") system to provide Class Members with responses to frequently asked questions and provide important information regarding the Settlement. This hotline will be accessible 24 hours a day, 7 days a week.

## REACH AND FREQUENCY

23.     The media notice program is designed to deliver a 70.03% reach with an average frequency of 3.0 times each. The 70.03% reach does not include the print Publication, which is a standalone effort.  Therefore, the overall reach of the integrated notice program, which includes

publication of the settlement notice in *Organic Life* magazine and the publication of four ads in the California regional edition of *USA Today* will surpass the 70.03% reach percentage achieved via the internet banner notice program alone. Similarly, the informational website and toll-free hotline are not calculable in the reach percentage but will nonetheless aid in the informing the class members of their rights and options under the settlement.

## CONCLUSION

24.     The notice program outlined above includes an integrated media notice effort that incorporates state of the art internet banner notice and traditional print publication notice. The internet banner notice portion of the plan is designed to reach 70.03% of the class on average 3.0 times each. This effort is supplemented with traditional print publication notice in *Organic Life* magazine and the California regional edition of *USA Today*. These efforts combine to provide the class the best notice practicable under the circumstances.

25.     Courts systematically rely upon reach and frequency evidence in reviewing class action notice programs for adequacy. The reach percentage and the number of exposure opportunities here, meet or exceed the guidelines as set forth in the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide.*

26.     It is my opinion that the Notice Program is fully compliant with Rule 23 of the Federal Rules of Civil Procedure, provides Due Process of Law and is the best notice that is practicable under the circumstances, including giving individual notice to all members who can be identified through reasonable effort.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
STEVEN WEISBROT

Dated: June 21, 2016

10

# EXHIBIT D

**If you purchased certain Seventh Generation, Inc. ("SVG") Products, you may be eligible to receive a payment from a Class Action Settlement.**

If you purchased certain SVG Products, you may be eligible to receive a payment from a Settlement. There is a class action Settlement involving SVG Products. The lawsuit alleged that SVG violated state and federal laws regarding the labeling, marketing, and advertising of certain SVG Products. SVG denies any and all wrongdoing of any kind whatsoever and denies any liability to Plaintiffs and to the Settlement Class. The Court has not decided who is right. Both sides have agreed to settle the dispute and provide an opportunity for payments and other benefits to Class Members.

## WHO IS INCLUDED IN THE SETTLEMENT?

All persons and entities who resided in the United States and purchased in the United States any of the SVG Products for household use or personal consumption and not for resale from November 14, 2010 to [date of preliminary approval order] are included in the Settlement. More information about the SVG Products involved in the Settlement is available at [insert website] or by calling [insert toll-free number].

## WHAT DOES THE SETTLEMENT PROVIDE?

The Settlement provides a settlement fund of $4,500,000.00 to pay (1) Claims of eligible Class Members; (2) the costs of notice and administration; (3) attorneys' fees and costs; and (4) any Incentive Award made by the Court to Plaintiffs. Class Members who timely submit valid Claim Forms are entitled to receive a cash payment from the Settlement fund.  The actual amount recovered by each Settlement Class Member will not be determined until after the Claim Period has ended and all Claims have been calculated.

## WHAT ARE MY RIGHTS?

1. **Participate in the Settlement by Submitting a Claim**. If you wish to participate in the Settlement and be eligible to receive benefits under the Settlement, you MUST fill out and submit a Claim Form by [deadline date]. You can obtain a Claim Form by (1) Visiting the Settlement website at [insert website] where you can file your claim online or print a claim form to submit by mail; (2) Mailing a written request for a Claim Form to: [insert mailing address]; (3) Emailing the Settlement Administrator at [insert email address]; or (4) Calling Toll-Free [insert toll-free number]. If you do not timely submit a valid Claim Form and do not exclude yourself from the Settlement, you will be bound by the Settlement but will not receive any benefits of the Settlement.

2. **You Can Object to the Settlement**.  If you do not agree with the Settlement or any part of it, you may submit a written objection to the Court. The deadline for submitting an objection is [insert deadline].

3. **You Can "Opt Out" of the Settlement**.  If you don't want to be legally bound by the Settlement, you must exclude yourself by [insert deadline] or you won't be able to sue, or continue to sue, SVG about the legal claims in this case. If you exclude yourself, you cannot get money from this Settlement. The detailed notice, available at [insert website], explains how to exclude yourself or object. If you do nothing you will be bound by the Court's decisions. The Court will hold a hearing on [insert final hearing date] to consider whether to approve the Settlement, a

request for attorneys' fees and costs up to $1,500,000.00, and Incentive Awards for the Plaintiffs totaling $10,00.00, from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

**FOR MORE INFORMATION**: **Call Toll-Free [insert number] or visit [insert website]**

# EXHIBIT E

# PRODUCT LIST

Surface Cleaners (Toilet Bowl Cleaner, Shower Cleaner, All Purpose Cleaner, Glass & Surface Cleaner, Tub & Tile and Specialty Cleaners (Wood, Granite and Stainless Steel) – all sizes/fragrances)

Autodish (Dishwasher Detergent Powders, Pacs, Gels and Rinse Aid – all sizes, fragrances)

Baby Home Care (Laundry Detergent (2X and 4X), Baby Bottle and Dish liquid, Baby Stain and Spot Spray and Natural Nursery & Toy Cleaner)

Baby Personal care (Lotion, Foaming Shampoo & Wash, Shampoo & Wash, Gel Wash, Bubble Bath and Diaper Cream)

Baby Wipes (All sizes, All Forms)

Dish Liquid (all sizes, fragrances)

Fabric Softener Liquid & Sheets (all sizes, fragrances)

Hand Wash – (All sizes, fragrances)

Laundry Additives – (Laundry Stain Spray, OXI stain Remover (Powder), and Chlorine Free Bleach)

Laundry Liquid (all sizes, fragrances, concentrations)

Laundry Powder/Pacs (All sizes, fragrances, concentrations)

49801843v.1

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TZIVA RAPOPORT-HECHT, MAGGIE TSAN, and ERICA WILDSTEIN, individually and on behalf of all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>SEVENTH GENERATION, INC.,<br><br><div align="center">Defendant.</div> | No. 7:14-cv-09087-KMK<br><br>**DECLARATION OF MICHAEL F. JACOBSON, PH.D., IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, PRELIMINARY CERTIFICATION OF SETTLEMENT CLASS, AND APPROVAL OF NOTICE PLAN** |

Pursuant to 28 U.S.C. § 1746, I, Michael F. Jacobson, Ph.D., declare as follows:

1.      I am Co-Founder and President of the Center for Science in the Public Interest ("CSPI"), a 501(c)(3) non-profit organization that focuses on consumer advocacy.

2.      I respectfully submit this declaration in support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, Preliminary Certification of Settlement Class, and Approval of Notice Plan.

3.      The facts set forth herein are of my own personal knowledge and, if called and sworn as a witness, I could competently testify to them.

4.      CSPI is based in Washington, D.C.

5.      I am submitting this declaration in support of appointment of CSPI as a *cy pres* recipient of unclaimed Settlement funds in this case. CSPI will use any *cy pres* award this Court approves to support projects to benefit the Settlement Class, or similarly situated persons, and to promote the law consistent with the objectives and purposes of this case's underlying claims. In particular, CSPI will use any *cy pres* award to help advance the rights of consumers around the country to be free of deceptive and unfair practices, including false and misleading labeling and

<div align="center">1</div>

advertising, and to enforce, and help others enforce, consumer rights and consumer protection laws.

6.      This declaration will describe my background and experience and the activities of CSPI in some detail, with particular emphasis on our successful advocacy on behalf of consumers nationwide.

**My Background and Experience**

7.      As President of CSPI, I am responsible for directing a national consumer-advocacy organization that focuses on food and health issues.

8.      I hold a bachelor's degree in chemistry from the University of Chicago.

9.      I earned a Ph.D. in microbiology from Massachusetts Institute of Technology in 1969.

10.     After receiving my Ph.D., I worked at the Center for the Study of Responsive Law in Washington, DC, where I first learned about consumer advocacy in the food area.

11.     I have written numerous books and reports, including *Marketing Madness: A Survival Guide for a Consumer Society*.

12.     I appear frequently in the news media, such as the New York Times, Washington Post, Wall Street Journal, Associated Press, CBS-TV, ABC-TV, NBC-TV, National Public Radio, and Huffington Post, and have testified at numerous Congressional hearings.

13.     My personal honors include

1992   Food Marketing Institute, Esther Peterson Consumer Service Award

1996   Food and Drug Administration, Commissioner's Special Citation, and Harvey W. Wiley Medal

2000   Time Magazine, One of the Nation's 100 Innovators.

2001   Consumer Federation of America, Esther Peterson Consumer Service Award for

distinguished service to consumers over the past three decades

2004   C. Everett Koop Award for Health Promotion and Awareness, American Diabetes
Association

2009   Pioneering Innovation Award, Centers for Disease Control and Prevention and Robert
Wood Johnson Foundation

2010   CDC Foundation Hero Award

2011   David P. Rall Award for Advocacy in Public Health, American Public Health Association

14.     I have served on the Board of Directors of Consumers Union.

**General Background about the Center for Science in the Public Interest**

15.     CSPI is a leading consumer advocacy non-profit, established in 1971 by myself

and two other Ph.D. scientists after we met while working at Ralph Nader's Center for the Study

of Responsive Law.

16.     In the 45 years since its founding, CSPI has worked tirelessly to conduct

innovative research and advocacy programs to provide consumers with current, useful

information about health and nutrition. In general, CSPI's three main goals are:

- To provide useful, objective information to the public and policymakers
  and to conduct research on health, the environment, and other issues
  related to science and technology;

- To represent the citizen's interests before regulatory, judicial, and
  legislative bodies; and

- To ensure that science and technology are used for the public good and to
  encourage scientists to engage in public-interest activities.

17.     CSPI's major projects typically feature a mix of research, education, and

advocacy. The staff sees a symbiosis between those approaches: research provides the basis for

education, education a backdrop for advocacy, and advocacy a means for educating the public

through publications and media coverage.

3

18.     CSPI's many notable successes include its petition to the Food and Drug

Administration to ban partially hydrogenated oils (*i.e.*, trans fat), which the Food and Drug

Administration granted in 2016, and its campaign to oust soft drinks from public schools. CSPI

also helped New York City adopt the nation's first ordinances to list calorie information on

menus and menu boards, and it is working with other cities and states on similar measures.

19.     Recognizing the valuable work of CSPI, the Food and Drug Administration

bestowed its highest award for service to public health, the Harvey W. Wiley Special Citation,

upon it in 2007.

20.     CSPI is governed by a volunteer board of directors operating under its articles of

incorporation and bylaws. The size of CSPI's board has varied between six and 14 people, and

its members have been from various walks of life, including scientists, attorneys, celebrities, and

activists.

21.     CSPI is primarily funded by the 600,000 subscribers to its *Nutrition Action

Healthletter* and individual donors. Private foundation grants make up approximately 5% to 10%

of CSPI's annual revenue of $15 million. *Nutrition Action Healthletter* accepts no advertising,

and CSPI accepts no corporate funds or government grants. Over the years, CSPI has received

funding from a diverse group of foundations and individuals, including:

> Louis & Anne Abrons Foundation
> Amaturo Family Foundation
> desJardins/Blachman Fund of the Silicon Valley Community Foundation
> The Barkley Fund
> Bloomberg Philanthropies
> The California Endowment
> Center for Communications, Health and the Environment (CECHE)
> Crown Family Philanthropies
> Farvue Foundation
> The Freed Foundation
> Gaia Fund
> Gegax Family Foundation

The Davee Foundation
The Grodzins Fund
Robert Wood Johnson Foundation
Kresge Foundation
Bernard Lewis Charitable Trust
The Marisla Fund
The Moon Drunk Fund
Ralph E. Ogden Foundation
The Park Foundation
The Pew Charitable Trusts
Saperstein Family Fund
Springbank Foundation
The Streisand Foundation
Flora L. Thornton Foundation
Wallace Genetic Foundation

22.     CSPI has received *cy pres* and class action settlement awards in the past,

including in the following lawsuits:

- *Ford v. Hoffman-La Roche Ltd.*, No. 00-CV-202080CP (Ont. Super. Ct.) (Can.);

- *Schiller v. Flowers Foods, Inc.*, No. 04-CVS-012593 (N.C. Wake Cty. Super. Ct.); and

- *Laraia v. Rexall Sundown, Inc.*, No. 50200 CA 00 7021XXPLAF (Fla. 15th Cir. Ct.), and *Teranchi v. Rexall Sundown, Inc.*, No. BC232370 (Fla. 15th Cir. Ct.).

CSPI has also received *cy pres* funds anonymously on one occasion. Funding from *cy pres*

awards has been used for purposes including the following, as appropriate for the particular case:

to protect consumers from false and misleading labeling and advertising; and to educate to

improve diets through knowledge of diet and health.

**CSPI's Leadership on Issues Involving Unfair and Deceptive Acts and Practices**

23.     CSPI has provided substantial leadership on issues involving unfair and deceptive

acts and practices, including false and misleading labeling and advertising.

24.     Since 1980, CSPI's scientists, writers, and organizers have been bolstered by an

in-house legal staff. CSPI's scientists and policy specialists actively encourage companies to improve their products and market them honestly. When necessary, the organization's legal staff seeks solutions through enforcement of existing laws or promoting the adoption of new regulations or legislation.

25.     CSPI's advocacy efforts have spurred improvements in food labeling and getting the FDA to stop deceptive food labels.

26.     CSPI established its litigation department in 2004. Since then, CSPI has pursued countless labeling violations and achieved many significant legal victories. In its pursuit of transparent labeling, CSPI has litigated against and/or negotiated with numerous Fortune 500 corporations.

27.     CSPI's litigation department has litigated and/or negotiated myriad cases, including the following:

- **Airborne.** In *Wilson v. Airborne*, No. 5:07-cv-00770-VAP-OP (C.D. Cal.), CSPI and private counsel successfully negotiated an approved class action settlement relating to the supplement Airborne. Contrary to the company's immunity claims over the course of several years, Airborne is completely ineffective in preventing colds. The settlement resulted in distribution of approximately $12 million in cash to class members and an additional approximately $7 million in *cy pres* grants directed (in varying amounts) to organizations that had submitted proposals for projects "intended to prevent or cure the common cold, flu, or other illness; research and other efforts to raise consumer awareness of and/or educating consumers about the safety and efficacy of dietary supplements; [and] research and other efforts to ensure the safety and efficacy of dietary supplements." Minute Order Granting Motion to Modify Scope of *Cy Pres* Award (in Chambers) at 2, *Wilson v. Airborne*, No. 5:07-cv-00770-VAP-OP (C.D. Cal. Jan 12, 2012), ECF No. 271.

- **Kellogg Company.** In a landmark settlement (after a demand letter but without need for litigation) with CSPI and others, Kellogg Company agreed to adopt nutrition standards for the foods it advertises to young children. Kellogg foods advertised on children's media—such as Nickelodeon and other TV, radio, print, and third-party websites that have an audience of 50 percent or more children under age 12—must meet

Kellogg's new nutrition standards. For all products, Kellogg agreed to stop sponsoring product placements in children's media and to stop advertising in preschools and elementary schools.

- **Soft Drinks in Schools.** In another case settled prior to litigation, CSPI's negotiations with the major soft drink companies to get soft drinks out of public schools paved the way for an agreement announced through the Clinton Foundation and the American Heart Association. Coca-Cola, PepsiCo, and Cadbury Schweppes agreed to phase out sugary soft drinks from schools.

- **Vitaminwater.** CSPI's litigation department served as co-counsel in this class action lawsuit filed in the U.S. District Court for the Eastern District of New York. Under the name "Glaceau," Coca-Cola marketed vitaminwater as a healthful alternative to soda by labeling its several flavors with such health buzz words as "defense," "rescue," "energy," and "endurance." The company made a wide range of dramatic claims, including that its drinks reduce the risk of chronic disease, reduce the risk of eye disease, promote healthy joints, and support optimal immune function. In fact, the 33 grams of sugar in each bottle of vitaminwater do more to promote obesity, diabetes, and other health problems than the vitamins in the drinks do to perform the benefits that were listed on the bottles. Despite the full names of the drinks, such as "endurance peach mango" and "focus kiwi strawberry," vitaminwater contains between zero and one percent juice. Coca-Cola filed a motion to dismiss the case, but the request was denied. Former U.S. District Judge John Gleeson ruled that the company's use of the word "healthy" violated the Food and Drug Administration's regulations on vitamin-fortified food, which prohibit companies from making health claims on foods that only meet various nutrient thresholds via fortification. Judge Gleeson also stated that the Food and Drug Administration discourages names of products that mention some ingredients but exclude more prominent ingredients such as, in the case of vitaminwater, added sugar. The names of the drinks, along with other statements on the label, had "the potential to reinforce a consumer's mistaken belief that the product is comprised of only vitamins and water." *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG), 2010 WL 2925955, at *13 (E.D.N.Y. July 21, 2010). On July 18, 2013, U.S. Magistrate Judge Robert M. Levy recommended that the suit proceed as a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2). *Ackerman v. Coca-Cola Co.*, No. 09 CV 395 DLI RML, 2013 WL 7044866 (E.D.N.Y. July 18, 2013). The case settled on a class-wide basis, and the settlement was granted final approval in 2016.

- **Aurora Dairy.** In 2007, CSPI joined a lawsuit in California against Aurora Dairy, the second-largest organic milk company. Aurora produced

non-organic dairy products that it sold as "organic." Consumers pay premium prices for organic products, but in this case—due to the illegal behavior of Aurora—they were ripped off. Aurora's practices violated both federal and California consumer protection and organic laws. A federal judge ruled that these consumers' rights are preempted by federal law, but the Eighth U.S. Circuit Court of Appeals reversed the decision on appeal. The case was settled after the appeal. As part of the settlement, Aurora Dairy agreed to change its marketing practices.

- **Anheuser-Busch.** CSPI notified Anheuser-Busch of its intent to sue the company over caffeinated alcoholic drinks such as Anheuser-Busch's Bud Extra and Tilt. The drinks, dubbed "alcospeed" by CSPI, had more alcohol than beer and contained stimulant additives that are not officially approved for use in alcoholic drinks, including caffeine, taurine, ginseng, or guarana. No studies were available to support the safety of consuming those stimulants and alcohol together—but new research did indicate that the young consumers of these type of drinks were more likely to binge drink, become injured, ride with an intoxicated driver, or be taken advantage of sexually than drinkers of conventional alcoholic drinks. The viral marketing campaigns behind the drinks were clearly designed to appeal to young, and often underage, drinkers, according to CSPI. Anheuser-Busch agreed to talk, and CSPI was able to reach a settlement without needing to file suit. As part of the settlement with CSPI, Anheuser-Busch will remove the caffeine, guarana, and ginseng from its alcoholic beverages Tilt and Bud Extra. The company, which also settled with 11 state Attorneys General, agreed to remove the Tilt and Bud Extra websites until those drinks were reformulated without the stimulants, and the company agreed to urge competitors to cease production of their caffeinated alcoholic drinks. Alcospeed is no longer marketed.

- **Capri Sun.** CSPI met with Kraft officials to obtain their agreement to stop calling Capri Sun drinks "natural" because they are sweetened with the very-unnatural high-fructose corn syrup (HFCS). Kraft initially refused, but after CSPI filed suit, the company announced that it was in the process of getting rid of the claim.

- **Cadbury Schweppes.** CSPI had also been in talks with Cadbury over its use of "natural" to describe 7UP, also sweetened with HFCS. Within days of the suit against Kraft for Capri Sun, Cadbury agreed to drop the "natural" claim, and CSPI dropped a planned lawsuit against the company. Shortly after that, Cadbury agreed that it would remove "natural" from its Snapple brand as well.

## Regulatory Advocacy

28.     CSPI has sent numerous comments, letters, and petitions to government (and

other) entities, such as the Food and Drug Administration and the U.S. Department of

Agriculture, including comments concerning food labeling. Examples include comments to the

Food and Drug Administration on Proposed National Vending Labeling Standards (July 2011)

and on Proposed National Menu Labeling Standards (July 2011) and comments to the U.S.

Department of Agriculture on Proposed Nutrition Standards in the National School Lunch and

Breakfast Program (April 2011). A list of CSPI's comments, letters, and petitions since 1999 is

available on our website at http://cspinet.org/litigation/regulatory.html.

***Amicus Curiae* Briefs**

29.     CSPI is dedicated to promoting fairness and justice in the marketplace, including

by acting as an *amicus curiae* before trial and appellate courts in appropriate circumstances.

Notable instances in which CSPI has prepared briefs *amicus curiae* include:

- **Splenda.** Splenda is an artificial sweetener, but its makers (McNeil-PPC, Inc. and McNeil Nutritionals, LLC) promote Splenda in a way that misleads consumers into believing that Splenda is a simply natural form of sugar without the calories: "Made From Sugar, Tastes Like Sugar." CSPI's consumer research surveys showed that consumers think of Splenda as "natural" or "not an artificial product." In truth, Splenda is a synthetic chemical that contains chlorine and is not natural. The Sugar Association sued McNeil on behalf of its members, to stop this deceptive practice. McNeil moved to dismiss the suit, claiming in part that the Sugar Association had waited too long to sue. CSPI filed an *amicus curiae* brief, advising the court that it is in the public's interest to stop fraudulent and misleading marketing at any point—even four years after the start of the deceptive Splenda campaign. The court agreed with CSPI's position, and denied the motion to dismiss.

- **Warnings on Sugary Drinks in San Francisco.** In 2015, the City and County of San Francisco passed an ordinance requiring certain kinds of advertisements related to sugar-sweetened beverages to display the following warning from the City: "WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay. This is a message from the City and County of San Francisco." S.F. HEALTH CODE § 4203(a). The American Beverage Association, the California Retailers Association, and the California State Outdoor Advertising Association sued the City and sought a preliminary injunction, arguing the ordinance

violated their constitutional rights. Together with the American Heart Association, the American Academy of Pediatrics, ChangeLab Solutions, and numerous other public interest organizations, CSPI submitted an *amicus curiae* brief in February 2016 opposing entry of a preliminary injunction, arguing, among other things, that the City responded appropriately to the public health epidemics of obesity, type 2 diabetes, and tooth decay, each of which are driven significantly by consumption of sugary drinks; that the accuracy of the warning is scientifically well established; and that the warning is a factual and accurate commercial disclosure that easily passes the applicable First Amendment review. In May 2016, the court agreed with CSPI's position and denied the motion for a preliminary injunction, holding that the plaintiffs were not likely to succeed on the merits of their First Amendment claim, that they had not shown that irreparable harm was likely or that the balance of equities weighed in their favor, and that the public interest weighed in favor of the City. *Am. Beverage Ass'n v. City & Cty. of San Francisco*, No. 15-CV-03415-EMC, 2016 WL 2865893, at *18–19 (N.D. Cal. May 17, 2016).

- **Sodium Warnings on Restaurant Menus in New York City.** In 2015, the New York City Board of Health adopted a rule requiring that larger restaurant chains post icons on their menus warning patrons when any single item exceeds by itself the U.S. government's recommended daily limit for sodium intake. The National Restaurant Association filed suit against the Board of Health in New York state court, seeking an order preliminarily enjoining implementation and enforcement of the rule on various grounds, including the First Amendment and preemption by the Nutrition Labeling and Education Act. In February 2016, the court denied the motion for a preliminary injunction, and the National Restaurant Association subsequently appealed. On appeal, CSPI and the American Heart Association, ChangeLab Solutions, and many other medical and public health organizations submitted an *amicus curiae* brief asking the appellate court to affirm the trial court's order, arguing, among other things, that overconsumption of sodium is a severe threat to public health, the health benefits of reducing sodium consumption are well established and not scientifically controversial, fast food and other chain restaurants contribute significantly to sodium overconsumption, and warnings are needed because consumers lack awareness of their own sodium consumption. *See Nat'l Rest. Ass'n v. N.Y.C. Dept. of Health & Mental Hygiene*, No. 654024/2015 (N.Y. Sup. Ct.).

**Consumer Education**

30.     From its earliest days, CSPI has recognized the value of producing educational materials. For example, CSPI's Alcohol Policies Project has produced several publications that

10

generated an immense amount of discussion. Those groundbreaking reports helped expand the national alcohol agenda from the treatment of alcoholism to include preventing alcohol abuse and alcoholism. *The Booze Merchants*, *Marketing Booze to Blacks*, *Marketing Disease to Hispanics*, and a report on federal alcohol taxes provided the public and journalists with cogent analyses of alcohol advertising and taxes. Those reports helped generate reforms in alcohol advertising and alcohol taxes.

31.     In addition to CSPI's award-winning *Nutrition Action Healthletter*—the largest-circulation health newsletter in North America—CSPI has produced a wide range of other publications concerning food. The book that first brought CSPI to public attention was *Nutrition Scoreboard*, which was published in 1973 and focused attention on the amount of fat and sugar in many foods. A simple scoring system I devised was one of the first efforts to make nutrition more understandable to the public.

32.     CSPI has also distributed millions of copies of colorful, fact-filled posters on nutrition and food additives. *The Fast-Food Guide*—in book and poster versions—helped focus the spotlight on nutritional drawbacks of the most popular foods offered by fast-food restaurants. Books for children (*e.g.*, *Kitchen Fun for Kids*) and for parents and teachers (*e.g.*, *Creative Food Experiences for Children*, and *Eat, Think, and Be Healthy*) reflected CSPI's concern that good nutrition begin at a young age.

**Conclusion**

33.     In addition to the information set forth above, extensive further background information on CSPI's staff and activities is available on our website at www.cspinet.org.

34.     A *cy pres* award to CSPI will benefit the Settlement Class, or similarly situated persons, and will promote the law consistent with the objectives and purposes of the underlying

claims in this case. CSPI will use any such award to protect and advance the rights of consumers in California and throughout the country, including their rights to be free of deceptive and unfair practices such as false and misleading labeling and advertising. I would be more than pleased to provide any additional information directly to the Court that it might require.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 15, 2016, at Washington, District of Columbia.

Michael F. Jacobson, Ph.D.

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TZIVA RAPOPORT-HECHT, MAGGIE TSAN, and ERICA WILDSTEIN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>SEVENTH GENERATION, INC.,<br><br>     Defendant. | No. 7:14-cv-09087-KMK<br><br>**DECLARATION OF RICHARD E. DUBOIS, EXECUTIVE DIRECTOR, NATIONAL CONSUMER LAW CENTER** |

## DECLARATION OF RICHARD E. DUBOIS

I, Richard E. Dubois, do hereby declare as follows:

1.      I am the Executive Director of the National Consumer Law Center ("NCLC" or the "Center"), a 501 (c) (3) non-profit organization that focuses on the consumer and energy problems facing low-income and elderly people.  The matters set forth herein are of my own personal knowledge and, if called and sworn as a witness, I could competently testify regarding them.

2.      NCLC is based on Boston and operates a branch office in Washington, D.C. As Executive Director of NCLC, I am responsible for priority setting, project assignments, and quality of work at the organization and direct all research, policy and advocacy projects as well as Center policy-making, hiring, fundraising and budgetary planning.

3.      I am submitting this declaration in support of plaintiff's motion for *cy pres* distribution.  NCLC will use any *cy pres* award that this Court approves to support projects to benefit the Settlement Class in this case, or similarly situated persons, and to promote the law consistent with the objectives and purposes of this case's underlying causes of action.  In particular, NCLC will use any such award to help advance the rights of consumers around the country to be free of deceptive and unfair practices, and to enforce – and help others enforce – consumer rights and consumer protection laws.

4.      This declaration will describe my background and experience and the activities of NCLC in some detail, with a particular emphasis on our successful advocacy on behalf of consumers nationwide.

### My Background and Experience

5.      I received a B.A. in history from Yale University and a J.D. from the University of Michigan Law School.

6.      After law school I worked for the Center for Insurance Research from 1995 to 1997, a nonprofit organization that advocates for the rights of individual consumers in the insurance marketplace.  I joined NCLC as a staff attorney in 1997 and focused on foreclosure

prevention, consumer bankruptcy, and warranty law. I engaged in public policy analysis, provided case consulting advice to attorneys, and wrote extensively on consumer issues. In addition, I led trainings and conference sessions for housing counselors, legal aid attorneys, private lawyers, and other advocates. I was a co-author of Consumer Warranty Law, a contributing author to Surviving Debt, and co-author of a model state law on home improvement contracting.

7.      I served as NCLC's Director of Development and Project Planning from 2008 to 2014 and as the organization's Deputy Director from 2014 to 2015. Among other management duties, I was responsible for all fundraising and communications activities, including individual gifts, *cy pres* awards, corporate and foundation support, and federal and state grants; and also conferences, trainings and special events. I was appointed Executive Director of NCLC effective January 1, 2016.

### General Background about the National Consumer Law Center

8.      The National Consumer Law Center was founded at the Boston College School of Law in 1969. Our staff of 21 attorneys averages 25 years of specialized consumer law expertise. NCLC directly combats unfair and deceptive sales practices through consumer protection litigation, support for a national network of consumer attorneys, and policy advocacy to strengthen consumer protection laws. NCLC focuses on the most significant consumer problems faced daily by lower-income families. For more than four decades NCLC has been a leading source of legal and public policy expertise on consumer issues for lawyers, federal and state policymakers, consumer advocates, journalists, and community-based organizations.

9.      NCLC is dedicated to promoting fairness and justice in the marketplace. We focus on unfair and deceptive acts and practices that hurt low-income and economically disadvantaged individuals, families, and neighborhoods. Unfair practices squeeze precious dollars from the poor and undermine their efforts to build wealth and financial security.

10.      The National Consumer Law Center is governed by a volunteer national board of directors, which includes bar association representatives and clients from low-income

communities. NCLC's staff of experts provides a wide range of direct assistance to consumer attorneys, including consultation on legal issues, co-counseling, expert testimony, legal research, continuing legal education, and widely respected legal treatises. NCLC gives priority to providing case assistance and training targeted at legal aid and *pro bono* attorneys representing low-income clients. We are a national organization providing support of consumer advocates working on behalf of low-income families. NCLC has trained and advised thousands of advocates, appeared in cases throughout the nation as well as working with state and federal commissions and legislatures, and testified upon invitation.

11.    NCLC is a frequent recipient of *cy pres* funds. Since 1997 we have received over 400 *cy pres* and class action settlement awards. Funding from *cy pres* awards is used for the benefit of consumers who have suffered unfairly in the consumer marketplace and for whom effective consumer protection is necessary.

12. NCLC's considerable expertise is made available to public officials, attorneys, and other advocates nationwide who are concerned with consumer rights of Americans. In February 2013, NCLC received a cy pres award in *Armuth v. John Linton; Mercatis Ventures I Llc et al.*, C.D. Cal. (Case No.: 2:10-CV-03657-AHM-E). The class action sought to stop untrue and misleading advertising that was used to influence consumers into purchasing knock-off skin care products in violation of California's False Advertising Law, Unfair Competition Law, and Consumers Legal Remedies Act.

13.    Further information about NCLC's leadership in the legal community is included in a document entitled "About the National Consumer Law Center," attached hereto as Exhibit 1.

**NCLC's work on issues involving unlawful sales and deceptive advertising**

14.    NCLC focuses our legal and policymaking work on the very statutes under which this lawsuit is brought – state unfair and deceptive acts and practices statutes such as California's Unfair Competition Law and the Consumers Legal Remedies Act. Examples of NCLC's prior work include the following:

15.     NCLC publishes the treatise *Unfair and Deceptive Acts and Practices* (8th ed. 2012 and 2013 Supp.), which is considered the essential legal manual for lawyers practicing in the area.  In exhaustive detail, it explains the meaning of deception and the standard for unfairness, and covers a broad range of transactions.  It has been cited by many courts.  For example, it covers both home improvement fraud and the fraudulent sale of water quality improvement devices. It includes a 50-state analysis of bait and switch, deceptive pricing, and "free" offers.  In addition, NCLC's treatise, *Federal Deception Law* (1st ed 2012 and 2013 Supp.) includes an extensive analysis of the Federal Trade Commission's rule requiring a cooling-off period for door-to-door sales and its state law counterparts.

16.     We have written or joined amicus briefs on unfair and deceptive acts and practices (UDAP) issues in numerous cases at the federal and state levels.

17.     NCLC has filed comments with the Federal Trade Commission on rules that involve false advertising.  For example, we filed comments when the FTC proposed to amend the telemarketing sales rule to address debt relief services.  We have filed comments with the CFPB regarding financial exploitation of seniors that covers advertising issues.

18.     We published a special report, *Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes* (2009), which analyzed the strengths and weaknesses of state UDAP statutes.

19.     NCLC writes up the definitive analysis of the Credit CARD Act's requirements for credit card advertising, as well as auto leasing and other consumer leasing advertising, and vocational school advertising.

20.     NCLC presented testimony before the U.S. House Financial Services Committee in 2009: "Legislative Solutions for Preventing Loan Modification and Foreclosure Rescue Fraud" which included information on false advertising.

21.     In 2010 NCLC published a fact sheet for advocates and social services providers who work with older Americans, *Home Improvement Scams Alert*,  The fact sheet describes how

typical scams operate and gives practical advice on how to help clients either avoid the problem or enforce their rights.

### NCLC's work on warranty issues

22. NCLC's work on warranty issues includes policy analysis, testimony and letters to public officials, policy briefs, Administrative agency comments, and resources for attorneys, including a detailed analysis of consumer protections against repossession.

23. NCLC publishes *Consumer Warranty Law* (4th ed 2010 and 2013 Supp.), the definitive treatise on warranty issues including automobile lemon laws and other warranty rights, automobile repair, manufactured home warranty laws, new house and condominium warranties, home improvements, service contracts and extended warranties, and warranty rights of consumers who lease vehicles.  This essential publication includes information on subjects including advantages to using the federal Magnuson-Moss Warranty Act, ways to defeat warranty disclaimers, avoiding contractual limitation on remedies, privity requirements, revoking acceptance, withholding payment and more.

### NCLC's California Consumer Justice Initiative

24. To help preserve the financial security of low-income people in California, NCLC launched the California Consumer Justice Initiative to address the needs of low-income consumers in the state. The Initiative helps consumers both to avoid predatory transactions and unfair practices and to obtain legal relief if they are victimized or treated unfairly in the marketplace. In addition, as described below, the Initiative offers a broad array of services to California legal aid and private attorneys, government officials, policymakers, community organizations, and journalists. Unlike any other consumer organization, NCLC can provide up-to- date legal information and analysis, educational seminars and conferences, telephone and e-mail support services, and educational materials for consumers. NCLC has also published special reports such as *A California Advocate's Guide to Telephone Customer Service Issues* and *A Legal Resource Guide for California Advocates: Challenging*

*Fraudulent Notario, Document Preparer, and other Non-Attorney Services*. NCLC has also translated consumer brochures into multiple languages (English, Spanish, Chinese, Korean, Russian, and Vietnamese), including: *Cashing Checks; Borrower Beware: The High Cost of Small Loans, Pawn Brokers and Rent-to-Own Stores*; *The Truth About Credit Reports*; *Money Wiring*; and *Beware of Dishonest Immigration Consultants*. The Initiative was created in recognition of the legal importance to the country of consumer protection efforts in California.

### NCLC's Public Education Program

25.     Apart from our publications for attorneys, NCLC writes books and other educational materials for consumers themselves and for our large network of lay advocates and service providers.  Written in clear and direct language, these materials give practical advice on how to make smart choices in the face of serious consumer problems.

26.     *The NCLC Guide to Surviving Debt* (2013 edition) is written for consumers overwhelmed by financial hardship.  It offers authoritative yet easy-to-understand information for individuals hurt by unfair business practices (including home improvement contracts) and subsequent financial problems.

27.     In addition, NCLC has written and disseminated scores of brochures on common consumer troubles, many of which have been translated into multiple languages (Spanish, Chinese, Korean, Russian, and Vietnamese).  With funding from the U.S. Administration on Aging and other sources, NCLC develops consumer education brochures on consumer frauds and abuses and consumer law rights, for distribution by local agencies, programs, and community groups.

28.     NCLC responds to requests from journalists for information and disseminates policy papers on important consumer issues.  We are consulted and quoted regularly by the *New York Times*, *Wall Street Journal*, *USA Today*, *Los Angeles Times*, *Washington Post*, and other

major news organizations.  We work with the media to alert consumers to potential scams, and provide tips on practical steps to take to avoid abusive transactions and to obtain relief.

29.    An essential element of our advocacy is our close relationship with thousands of legal services advocates who work directly with lower-income consumers.  These advocates share their experiences with us and give us direct contact with the day-to-day experiences of their clients.  This information from the "ground up" informs our advocacy with policymakers

30.    Through all of its activities, NCLC is committed to promoting equal access to justice for consumers.  Funding is used for the benefit of consumers, especially low-income consumers, who are treated unfairly in the consumer marketplace and need legal help.  NCLC's expertise is made available to public officials, attorneys, and other advocates nationwide who protect the consumer rights of Americans.

### Uses of Cy Pres Funds

31.    With the benefit of *cy pres* funds, the National Consumer Law Center will engage in activities which are consistent with the objectives and purposes of the underlying cause of action in this case.

38. NCLC uses *cy pres* funds to help protect consumers from unfair and deceptive acts and practices, and breaches of express warranty.  Specific activities include:  (a) researching and publishing materials on how state Unfair and Deceptive Acts and Practices (UDAP) statutes can be used to combat consumer fraud and abuse; (b) increasing legal resource materials on UDAP litigation that is available electronically (e.g. through NCLC's website); (c) promoting the use of UDAP statutes to reduce consumer fraud (this would include amicus briefs; case consultations and strategic litigation advice); (d) UDAP policy analysis and advocacy in the states (this would include writing special reports and producing model statutory language); (e) raising public and policymaker awareness of the need to strengthen consumer protections against unfair and deceptive acts and practices; (f) advising consumers and advocates on new

changes to FTC rules under the Magnuson-Moss Warranty Act that will significantly aid private consumer warranty litigation.

## Conclusion

39.     In addition to the information set forth above, extensive further background information on NCLC's staff and activities is available on our website at www.nclc.org.

40.     A *cy pres* award to the NCLC will benefit the class or similarly situated persons, and will promote the law consistent with the objectives and purposes of the underlying cause of action in this case.  NCLC will use any such award to protect and advance the rights of consumers around the U.S., including their rights to be free of deceptive and unfair practices and breaches of express warranties.  I would be more than pleased to provide any additional information directly to the Court that it might require.

41.     I declare under penalty of perjury under the laws of the State of California and the Commonwealth of Massachusetts that the foregoing is true and correct.  Executed this 1st day of July, 2016, in Boston, Massachusetts.

Richard E. Dubois
July 1, 2016